Original
No. LD-90-006

ASTLES' CASE

August 2, 1991

*Roussos, Hage and Hodes P.A.*, of Manchester (*Paul W. Hodes* and *Judith Fox Arsenault* on the brief, and *Mr. Hodes* orally), Bar Counsel, for the Committee on Professional Conduct.

*Orr and Reno P.A.*, of Concord (*Peter W. Mosseau* on the brief and orally), for the respondent, Bertram D. Astles.

BROCK, C.J.   On May 2, 1990, the Committee on Professional Conduct (Committee) filed a petition with this court seeking disbarment of the respondent, Bertram D. Astles. *See* SUP. CT. R. 37(13)(a). Soon thereafter, the respondent filed his answer, whereupon we referred the petition and answer to a Referee (*Bean*, J.) for a hearing and the filing of a written report containing findings of fact and rulings of law. *See id.* at (13)(e). In October 1990, the referee submitted his report, wherein he found that the respondent had violated the following Rules of Professional Conduct: 8.4(a) (violation of professional conduct rules), 8.4(c) (engaging in acts of misrepresentation and dishonesty), and 8.1(a) (knowingly making false statements in connection with a disciplinary matter). Based upon the referee's report, the Committee requests that this court order the disbarment of the respondent.

In response to this request, the respondent challenges neither the referee's rulings that there were violations nor the findings of fact which support those rulings. His only concern is with the severity of the discipline requested by the Committee. He argues that disbarment is "overly harsh" in light of the circumstances surrounding the violations and suggests alternative sanctions which he asserts will adequately protect the public and prevent the recurrence of similar violations. Fundamental to the question of sanctions is an examination of the gravity of the respondent's unprofessional conduct, as determined by his behavior, *see Flint's Case*, 133 N.H. 685, 689, 582 A.2d 291, 293 (1990), and, thus, we turn to the respondent's actions that are the basis for these proceedings.

In June 1987, after executing a note and mortgage to the Concord Savings Bank, the respondent and his wife purchased a home in Hopkinton. Less than a year later, the Astleses, who had begun to experience personal financial difficulties, sought a second mortgage on their home from The Money Store. The loan application and the

mortgage were signed only by the respondent, but he signed using two different signatures, one for himself and one for his wife. Although Mrs. Astles stated that she knew about the second mortgage and that she had authorized her husband to sign for her, the respondent never informed The Money Store of this authority.

In September 1989, the respondent sought yet a third mortgage on the couple's home from G.P. Finance Company. The loan application contained no indication of the second mortgage and, like the prior application, was signed twice by the respondent, once with his regular signature and once, in different handwriting, with his wife's signature. Unlike the application to The Money Store, however, Mrs. Astles was unaware of the proposed mortgage with G.P. Finance, and, hence, had not authorized her husband to sign for her. On receiving the application, G.P. Finance requested that Attorney J. Leonard Sweeney, Jr., process the loan and arrange for a closing. During a title search of the Astleses' property, Elaine Sweeney, Attorney Sweeney's wife and paralegal, discovered the undischarged second mortgage from The Money Store. When confronted with this discovery, however, the respondent knowingly lied to Mrs. Sweeney and told her that the second mortgage had been discharged, and that he had simply failed to record the original discharge.

This misrepresentation was the first of several made during the respondent's attempts to acquire financing from G.P. Finance. At the closing, the respondent produced a purported properly executed power-of-attorney that contained the signatures of his wife and a justice of the peace, and that authorized the respondent to sign and act on behalf of his wife. The respondent later admitted to the Committee, however, that, he had, in fact, signed his wife's name, without her knowledge, and that the justice of the peace was a fiction whom he had created. When questioned at the closing by Mrs. Sweeney about the authenticity of the power-of-attorney, the respondent reinforced the misrepresentation by telling her that the document had been properly executed. Mrs. Sweeney then contacted G.P. Finance to inquire if they would accept a power-of-attorney, and the company responded that, without Mrs. Astles's presence at the closing, the loan could not be authorized.

The matter was ultimately referred to the Professional Conduct Committee. The Committee forwarded the complaint to the respondent, who answered the allegations by letter to the Committee. In this letter, the respondent, rather than taking the opportunity to admit the error of his ways, continued his misrepresentations by stating that his wife had signed the mortgage to The Money Store as well as

the power-of-attorney, that his wife's signature had changed, that his wife knew of The Money Store mortgage, and that he had asked his wife for the power-of-attorney.

Philip T. McLaughlin, Esq., as chairperson of the Committee hearing panel, then sent a letter to the respondent asking specifically about the authenticity of the power-of-attorney. The respondent, again, answered by letter and continued to maintain his earlier misrepresentations. He falsely informed the Committee that his wife had, in fact, signed the power-of-attorney in front of a justice of the peace, whose name, the respondent claimed, she could not recall. Moreover, in order to provide a ring of truth to this claim, the respondent falsely reported that his wife had returned to the bank in an unsuccessful attempt to ascertain the name of the justice of the peace.

■ On March 21, 1990, the respondent appeared before a hearing panel of the Committee to respond to the allegations in the complaint. At the beginning of his testimony, the respondent made an opening statement wherein he admitted to the panel his chain of misrepresentations, starting with those made to G.P. Finance and the Sweeneys and ending with those made in his correspondence to the Committee. Based on the foregoing, the referee found, and the respondent does not now dispute, that, although they involved a personal transaction, the respondent's actions in seeking financing from G.P. Finance did constitute misconduct under the Rules of Professional Conduct. The referee also correctly noted that, even if there was a distinction between misconduct arising from the respondent's actions in personal matters and that arising from the respondent's conduct as an attorney, his lying to the Committee unquestionably fell into the latter category.

■■ The task of supervising and disciplining attorneys within this State falls squarely upon the shoulders of this court. *Mussman's Case*, 111 N.H. 402, 411, 286 A.2d 614, 620 (1971); RSA 311:8. When faced with the decision of whether to impose the ultimate sanction of disbarment, our focus rests, not on punishing the offender, but on protecting the public, maintaining public confidence in the bar, and preventing similar conduct in the future. *Flint's Case*, 133 N.H. at 688–89, 582 A.2d at 293; *Mussman's Case, supra* at 412, 286 A.2d at 620. The respondent offers several reasons in support of his assertion that disbarment would be too severe a penalty in this case. He asks us to consider that his initial misconduct involved dishonesty with respect to a personal matter, and not dishonesty in his role as an

attorney. Moreover, in an attempt to distinguish some of our prior disbarment cases, *see Nardi's Case,* 122 N.H. 277, 444 A.2d 512 (1982); *St. Pierre's Case,* 113 N.H. 198, 304 A.2d 88 (1973); *Silverstein's Case,* 108 N.H. 400, 236 A.2d 488 (1967), the respondent contends that his personal misconduct did not result in a criminal conviction. Finally, he argues that his misconduct before the Committee should not serve as a ground for disbarment because he voluntarily and spontaneously admitted his misconduct.

The respondent's arguments against disbarment ask us to examine his acts of dishonesty as unrelated, occurring on separate occasions, and each having mitigating circumstances that warrant some lesser sanction than disbarment. To do so, however, would ignore the respondent's continuing intent to deceive, as evidenced by the extension and embellishment of his original misrepresentations. Although we empathize with the difficult personal financial situation experienced by the respondent and the pressures created thereby, we can not and will not condone his chosen course of action in response to those pressures.

In today's society, more than ever before, the legal profession touches and affects nearly every facet of private and public life. Without debating the merits of this pervasiveness, one indisputable consequence of such an increase has occurred: the need for maintaining and requiring the highest possible levels of honesty and trustworthiness from the legal practitioners in this State. No single transgression reflects more negatively on the legal profession than a lie. As well as being the most fundamental of dishonesties, a lie is the most pernicious; it is easily and readily concealed and, as evidenced by the actions of this respondent, it serves as the seed for a growth of future dishonesty.

The respondent sought commercial financing for his home through dishonest and fraudulent means. Having had ample opportunity to consider and acknowledge his misconduct, the respondent, nevertheless, continued his deceit, assuring Elaine Sweeney that the power of attorney he offered was validly executed. Thereafter, when asked by the Committee to respond to the allegations of his dishonesty, the respondent, in his capacity as an attorney, persisted in his dishonesty, adding to it so that it would seem more like the truth. This illustrates the very point made by former president, statesman and lawyer, Thomas Jefferson, who noted that "[h]e who permits himself to tell a lie once, finds it much easier to do it a second and third time, till at length it becomes habitual; he tells lies without attending to it, and truths without the world's believing him. . . ."

██ Bertram D. Astles is hereby disbarred, and, at the end of two years, may petition this court for readmission to the New Hampshire bar, subject to all then-existing requirements for applicants seeking such admission. *See* SUP. CT. R. 37(2)(d). With regard to the Committee's costs of investigating and prosecuting this matter, the respondent argues that his admissions to the Committee saved them time and expense in their later investigation, and that, hence, he should not be assessed these costs. We disagree, finding that the respondent's misconduct warrants the assessment of costs incurred by the Committee in pursuing this matter, and order that he reimburse the Committee for those costs. *See id.* at 37(16).

*So ordered.*

HORTON, J., did not sit; the others concurred.