Original
No. LD-94-005

## BASBANES' CASE

May 13, 1996

*Anthony A. McManus*, of Dover, by brief and orally, for the committee on professional conduct.

*Tober Law Offices, P.A.*, of Portsmouth (*Stephen L. Tober* and *Julie E. Schachter* on the brief, and *Mr. Tober* orally), and *Wiggin & Nourie, P.A.*, of Manchester (*L. Jonathan Ross* on the brief), for the respondent.

THAYER, J. On June 20, 1994, the Supreme Court Committee on Professional Conduct (committee) filed a petition with this court seeking disbarment of the respondent, George J. Basbanes. *See*

SUP. CT. R. 37(13)(a). We appointed a Judicial Referee (*O'Neil*, J.) to conduct a hearing on the committee's petition. *See* SUP. CT. R. 37(13)(e). The referee found, by clear and convincing evidence, that the respondent violated Rules 3.3(a)(1), 3.3(a)(3), 8.4(a), and 8.4(c) of the New Hampshire Rules of Professional Conduct (rules) and recommended a two-year suspension. Both the respondent and the committee object to the referee's report. We order the respondent disbarred.

In 1992, the respondent began representing Nathaniel Tuttle in a divorce case. One of the issues in the divorce was the value of Tuttle's auto parts business and real estate and what portion of that property, if any, would be awarded to his wife. In October 1992, Tuttle informed the marital master that he and his business faced an outstanding civil judgment that might reduce the value of that property. The judgment stemmed from a lawsuit filed by Brian Downing, who was injured in a traffic accident involving one of Tuttle's company trucks. The judgment was for an amount in excess of Tuttle's insurance coverage, leaving him personally responsible for a portion of the judgment.

Some time prior to September 23, 1992, Tuttle agreed to assign to Downing his rights under the doctrine of *Dumas v. Hartford Accident & Indemnity Co.*, 94 N.H. 484, 56 A.2d 57 (1947), allowing Downing to sue Tuttle's insurance company for negligently failing to settle the accident case within his insurance limits. Downing's lawyer drafted the assignment, but the respondent added language to the original draft which prevented Downing from ever proceeding against Tuttle. After making that change, the respondent mailed the assignment to Downing's lawyer on October 14, 1992. According to the respondent, he never received a response confirming that the changes were acceptable.

Several months later, Downing settled with Tuttle's insurance company. A copy of a letter confirming the settlement was sent to the respondent's office in early February 1993, though he claims he did not remember seeing it until more than a year later.

On February 5, 1993, Downing's lawyer forwarded a general release (the 1993 release) prepared by the insurance company to the respondent, asking that he get Tuttle to sign it. Tuttle signed the release on February 17, 1993 — he was the first party to do so — and the respondent mailed it back to Downing's lawyer. According to the respondent, a fully executed copy of the release was never forwarded to him, so he considered the settlement incomplete. He testified that he never considered the settlement important enough to the divorce case to research whether the settlement was finalized thereafter.

Following the settlement correspondence outlined above, the respondent participated in several hearings in the divorce case. During three of the hearings, the respondent implied that the *Downing* judgment would remain outstanding and failed to inform the court that settlement discussions were nearly complete. On February 18, 1993, during cross-examination of Natalina Tuttle, Nathaniel Tuttle's wife, the respondent asked whether she would be liable for part of the *Downing* judgment if the auto parts business was forced to pay. According to the respondent, the question was designed to force Mrs. Tuttle to admit that she would not owe money to satisfy the judgment, thus undermining her claim that she was a co-owner of the business. Only a day earlier, however, the respondent had secured Mr. Tuttle's signature on the 1993 release designed to settle the *Downing* case without imposing any liability on Mr. Tuttle or his business.

During a hearing on April 1, 1993, the respondent questioned Mr. Tuttle, asking him why he could not afford to pay bills in the amount of $2,000 per month. Mr. Tuttle responded that he was unable to get credit at his bank because of an existing lawsuit. The respondent later claimed that his question referred to Mr. Tuttle's ability to pay bills in March 1992, before any settlement took place. Mr. Tuttle referred to the lawsuit in the present tense, however, and the respondent made no effort to correct the impression that no steps were underway to settle the case without imposing liability on Mr. Tuttle.

Finally, on June 2, 1993, the respondent cross-examined an expert witness hired by Mrs. Tuttle to appraise the couple's property. During his questioning, the respondent referred to the judgment in the *Downing* case, asking the expert whether he was aware of a judgment against the business. According to the respondent, he was trying to show that the expert did not consider relevant information in his appraisal.

During the respondent's questioning, the marital master specifically asked the respondent whether the judgment had been resolved. The respondent answered that he hadn't "heard anything about it. Sleeping dogs are lying." He then continued to convey the impression that the judgment would remain unsettled, agreeing with the marital master that the expert needed to know that the Tuttles might not owe anything in the *Downing* case. While he later concluded that he had made an error by not informing the marital master that he had received a release in the case, he claims that at the time of his response he did not consider the settlement complete because he had not received a fully executed release. He also claims

that he did not want to compromise his cross-examination of the appraiser by conceding that the case had been settled.

Following the close of testimony in the divorce case, the lawyer representing Mrs. Tuttle learned that the *Downing* judgment had likely been resolved in early 1993, prior to the hearings discussed above. The parties jointly submitted the settlement to the marital master and she concluded, in a decision issued July 16, 1993, that the respondent had wasted the court's time in asking questions and making statements which implied that the case remained unresolved.

Opposing counsel reported respondent's conduct to the committee. The committee held a hearing on April 20, 1994, and found that the respondent had violated Rules 3.3(a)(1), 3.3(a)(3), 8.4(a), and 8.4(c) when he referred to the *Downing* judgment without indicating that it was being settled. The committee recommended disbarment. On July 20, 1994, the committee denied a motion for reconsideration filed by the respondent.

The case was referred to a judicial referee for a *de novo* hearing. The referee found that the respondent violated several rules of professional conduct not only during the divorce proceedings, but also during the *de novo* hearing. More specifically, the referee agreed with the committee that the respondent violated Rules 3.3(a)(1), 3.3(a)(3), 8.4(a), and 8.4(c).

On June 14, 1995, the referee conducted a hearing on the question of discipline. The respondent called several witnesses who testified, among other things, to the respondent's good reputation and character. Based on that testimony, and on the fact that the respondent had no prior disciplinary record, the referee recommended a two-year suspension. Both parties objected to his report.

█    When we review a referee's findings, "our only function is to determine whether a reasonable person could have reached the same decision as the referee on the basis of the evidence before him." *Budnitz' Case*, 139 N.H. 489, 491, 658 A.2d 1197, 1198 (1995) (quotation omitted). In this case, we must determine whether a reasonable person could have found, by clear and convincing evidence, that the respondent violated Rules 3.3(a)(1), 3.3(a)(3), 8.4(a), and 8.4(c). *See Edes' Case*, 118 N.H. 815, 816–17, 395 A.2d 498, 499 (1978).

The rules of professional conduct provide, in relevant part:

Rule 3.3. Candor Toward the Tribunal
(a) A lawyer shall not knowingly:
(1) make a false statement of material fact or law to a tribunal; . . .

(3) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.

Rule 8.4. Misconduct
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; . . .
(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation . . . .

N.H. R. PROF. CONDUCT 3.3, 8.4. The respondent concedes that it was an error in judgment to withhold information about ongoing settlement negotiations from the marital master. Nonetheless, he asserts that the evidence does not prove that he intended to offer false testimony to the court and therefore argues that he did not violate any rules of professional conduct.

We disagree. The record indicates that the respondent knowingly made false statements and offered false evidence to the marital master in violation of Rules 3.3(1)(a) and 3.3(1)(c). The hearing on June 2, 1993, provides the strongest proof of the respondent's misconduct. During the hearing, the marital master asked the respondent whether there was a judgment in the *Downing* case and whether Tuttle would be responsible for paying it. The respondent answered that he was aware of a judgment, but he asserted that "we haven't heard anything about it. Sleeping dogs are lying."

At that time, however, the respondent had helped the parties attempt to settle the case. Therefore, his assertion that "sleeping dogs are lying" was not true. As the referee found, "[t]he dogs were not lying. The Respondent was." Even if we accept the respondent's claim that he believed the settlement was incomplete, he incorrectly told the court that he had not heard anything about the case. The referee found, and we agree, that his false statements were an effort to convince the marital master that his client was still liable for the *Downing* judgment, thus making it an issue in the division of the marital assets.

The respondent also misled the marital master during the February and April divorce hearings. By that time, the respondent had informed the master that there was an outstanding judgment against Mr. Tuttle, but he had not told her that settlement negotiations were nearly complete. Nonetheless, during both hear-

ings the respondent questioned witnesses about the *Downing* judgment as though no effort was underway to resolve the case. The respondent argues that his questions were meant to probe other issues unrelated to the settlement. Given what was known by the master, however, we agree with the referee that the respondent was trying to convey the impression that Mr. Tuttle would still be liable for the *Downing* judgment. After all, it was part of the respondent's trial strategy to minimize the value of Mr. Tuttle's property. Such conduct was dishonest.

In short, then, we believe a reasonable person could have found, by clear and convincing evidence, that the respondent made false statements and offered false evidence to the marital master in violation of Rules 3.3(a)(1) and 3.3(a)(3).

■ We also believe that a reasonable person could have found that the respondent violated Rules 8.4(a) and 8.4(c). A finding that the respondent violated Rule 3.3(a) triggers a finding that he also violated Rule 8.4(a). *See Carpenito's Case*, 139 N.H. 168, 173, 651 A.2d 1, 4 (1994); *Wood's Case*, 137 N.H. 698, 707, 634 A.2d 1340, 1345 (1993). At the same time, the record provides sufficient evidence to conclude that he violated Rule 8.4(c) by misrepresenting facts to the master. "An intentional misrepresentation requires a misstatement of fact for the purpose of inducing another to act or to refrain from action in reliance upon it." *Carpenito's Case*, 139 N.H. at 174, 651 A.2d at 4 (quotation omitted). The referee found that the respondent's questions regarding the *Downing* judgment were designed to induce the marital master into considering Mr. Tuttle's purported liability in the division of the marital assets. We agree and find that his effort was a violation of the rule.

Finding no error in the referee's conclusion that the respondent engaged in misconduct, we turn to the question of sanctions. "The purpose of the court's disciplinary power is to protect the public, maintain public confidence in the bar, preserve the integrity of the legal profession, and prevent similar conduct in the future." *Budnitz' Case*, 139 N.H. at 492, 658 A.2d at 1199 (quotation and ellipses omitted). The sanction we impose must be sufficient to satisfy those goals. *Welts' Case*, 136 N.H. 588, 592, 620 A.2d 1017, 1019 (1993). It must take into account both the severity of the misconduct and the mitigating circumstances disclosed by the record. *Id.*

■ We hold that the appropriate sanction in this case is disbarment. The record reveals that the respondent lied to the marital master over a period of several months. In this State, "[n]o single transgression reflects more negatively on the legal profession

than a lie." *Astles' Case*, 134 N.H. 602, 606, 594 A.2d 167, 170 (1991). We take this view of dishonesty for a simple reason: the privilege of practicing law "does not come without the concomitant responsibilities of truth, candor and honesty. . . . [I]t can be said that the presence of these virtues in members of the bar comprises a large portion of the fulcrum upon which the scales of justice rest." *Jones' Case*, 137 N.H. 351, 360, 628 A.2d 254, 259 (1993) (quotation omitted). In light of the importance we place on honesty and candor, the respondent's actions constituted serious misconduct and justify disbarment.

The respondent points to a series of mitigating factors that he argues justify a less severe sanction. *See Welts' Case*, 136 N.H. at 592, 620 A.2d at 1019. In our view, the mitigating factors fall far short of justifying a sanction other than disbarment.

Two of the mitigating factors that the respondent urges us to consider are simply not present. One involves the respondent's efforts to rectify his misconduct. On June 21, 1993, following the divorce hearings, the respondent submitted documents to the marital master which stated that the case had been settled and that a release had been prepared for Tuttle's signature. He argues that this submission was a good faith attempt to rectify his earlier misleading statements; however, the referee found — and the respondent does not dispute — that the respondent submitted those documents only after opposing counsel discovered the true status of the *Downing* case and said that he would inform the court that a settlement was complete. Under those circumstances, the respondent had no real choice but to consent to the submission of the documents; his actions do not justify a less severe sanction.

The other mitigating factor not present involves cooperation with the disciplinary proceedings. Although the respondent cooperated with the referee by submitting transcripts of relevant testimony from the divorce case, the referee found that his testimony during the *de novo* hearing was false and misleading. The referee points to the respondent's claim that he did not inform the marital master about the settlement because he did not remember receiving some of the information about the settlement. The referee described that explanation as "hogwash," stating that a lawyer "who has had the wheels moving to succeed in getting his client personally off the hook for a substantial amount of money [does not] dismiss[] it with a mere yawn." We see no reason to dispute the referee's conclusion.

We cannot give the respondent credit for cooperating with the disciplinary process when he misleads the referee about the extent of his misconduct. *See Fitzpatrick's Case*, 132 N.H. 211, 218, 566

A.2d 157, 161 (1989). In cases where cooperation has been treated as a mitigating factor, the respondent's cooperation has been total and complete. *See Welts' Case*, 136 N.H. at 592, 620 A.2d at 1019.

The remaining mitigating factors claimed by the respondent are insufficient to justify a sanction less severe than disbarment. The respondent argues that his lack of a disciplinary record during twenty-eight years as a lawyer indicates that his behavior in the divorce case was an aberration, thus justifying a lighter sentence. "Absence of a prior disciplinary record is an acknowledged mitigator, but it does not dispense with the necessity for disciplinary action." *Jones' Case*, 137 N.H. at 360, 628 A.2d at 259. We believe that the respondent's twenty-eight years of experience as a litigator could just as easily "justify an *increase* in the degree of discipline to be imposed." *Id*. The respondent, given his experience appearing before courts, should have known that more was required of him in his presentations to the marital master.

The respondent also urges us to consider his good reputation, his lack of a selfish motive, and his remorse, in considering the appropriate sanction. Even taking into account these factors, we do not believe that a sanction other than disbarment is warranted. As we have previously explained, "mitigating factors do not necessarily preclude disbarment," *Flint's Case*, 133 N.H. 685, 690, 582 A.2d 291, 294 (1990), particularly when the respondent's misconduct involves a continuing course of dishonesty.

In prior cases we have disbarred attorneys who lied to their clients or to the court. *See, e.g., Budnitz' Case*, 139 N.H. at 493, 658 A.2d at 1199; *Jones' Case*, 137 N.H. at 361, 628 A.2d at 260; *Astles' Case*, 134 N.H. at 607, 594 A.2d at 170; *Flint's Case*, 133 N.H. at 688, 582 A.2d at 293. In cases where we imposed a less severe sanction, the lawyer did not engage in a repeated course of misconduct, *see, e.g., Carpenito's Case*, 139 N.H. at 170–71, 651 A.2d at 2–3, or could point to more compelling mitigating factors than can the respondent, *see Welts' Case*, 136 N.H. at 592–93, 620 A.2d at 1019–20.

The respondent is hereby disbarred and is ordered to reimburse the committee for its expenses in investigating and prosecuting this case. *See* SUP. CT. R. 37(16). At the end of three years, he may petition this court for readmission to the bar, subject to all the requirements applicable to applications for admission to the bar. *See* SUP. CT. R. 37(2)(d).

*So ordered.*

BRODERICK, J., did not sit; the others concurred.