Original
No. LD-95-009

BRUZGA'S CASE

April 12, 2000

*Paul A. Maggiotto*, of Concord, by brief and orally, for the committee on professional conduct.

*David A. Horan*, of Manchester, by brief and orally, for the respondent.

BRODERICK, J. The Supreme Court Committee on Professional Conduct (committee) filed a petition to disbar the respondent, Paul

W. Bruzga. We appointed a Judicial Referee (*Dunn*, J.), who conducted a six-day hearing on the committee's petition. He found by clear and convincing evidence that the respondent violated the New Hampshire Rules of Professional Conduct (Rules) 3.1, 3.3(a)(1), 3.3(a)(3), and 8.4(a) when pursuing an abuse and neglect petition in Henniker District Court. The referee rejected numerous other allegations of professional misconduct and recommended that the respondent's license be suspended for six months. Both the committee and the respondent appeal. We order the respondent suspended from the practice of law for one year. We deny the respondent's request for costs, partially grant the committee's request for same, and remand to the referee to determine costs.

## I

The violations at issue arise out of post-divorce custody proceedings involving the respondent's son and daughter. The underlying facts are complex, and we recite only those supported by the referee's findings or otherwise undisputed. After approximately eight years of marriage, the respondent and his wife, Barbara Buck, divorced in 1985. They were awarded joint legal and physical custody of their children. Buck's home was to serve as their primary residence. The respondent was granted visitation according to a schedule that could be modified by mutual assent of the parties.

In 1992, the children began expressing their desire to live with their father. On Friday, August 28, 1992, Buck was scheduled to pick up the children at the respondent's residence. The children, however, spoke with her on the phone and again told her that they wanted to live with their father. When she attempted to pick them up that evening, Buck found no one at home. She testified that she called the respondent's residence over the weekend but was unable to contact anyone until Sunday or Monday. She later attempted to arrange with the respondent a visit with the children for the weekend of September 4. After telephone conversations with the children during the week, Buck attempted to retrieve them on Friday. According to Buck, the children refused to go with her because she would not agree in writing to return them to their father. Acrimonious litigation ensued.

From September 1992 through December 1992, the parties filed numerous pleadings with the superior court, which conducted several hearings on custody and contempt. Buck, for example, filed a contempt petition in September alleging, *inter alia*, that the respondent "refused to return the children to [Buck's] home . . . on

August 28, 1992, and at any time thereafter." While Buck did not demand the children's immediate return, she requested that the court appoint a guardian ad litem (GAL) for the children and order psychological evaluations for the entire family. The respondent objected and filed a cross-motion to modify custody.

A GAL was subsequently appointed. In mid-October 1992, after meeting separately with the parties and each child, the GAL filed a preliminary report with the court, outlining the parties' individual concerns and recommending therapy for the parties. The court ordered family counseling on October 29, 1992, and in late October or early November, Dr. Michael Vanaskie was selected to perform it. In its October 29 order, the court also directed the respondent to return the children to Buck no later than the start of the second half of the academic year, assigning the GAL the task of selecting specific dates. In December 1992, the court accepted the GAL's recommendation that the son be returned to Buck no later than January 2, 1993, and that the daughter be returned on January 30, 1993. Based on the GAL's recommendation, on December 29, 1992, the court directed that the respondent have no further contact with his son once returned to Buck's custody.

On January 8, 1993, within a week of the son's reunion with Buck, the respondent filed an abuse and neglect petition in the district court against Buck and her fiance, David Kimball, seeking to remove the child from their care. He signed and submitted several affidavits in support of the petition. On January 19, the district court dismissed the petition. The same day he filed the district court petition, the respondent also filed a professional conduct complaint against the GAL, seeking her disbarment, based in part on his allegation that she may have had an inappropriate relationship with Dr. Vanaskie. After the committee rejected his complaint, stating that it lacked authority to review the conduct of GALs, the respondent filed a motion in superior court to remove and sanction the GAL, which was denied. While the post-divorce litigation continued after January 1993, we need not review it further because the challenged misconduct occurred only between August 1992 and January 1993.

## II

We first address the committee's contention that the referee erred in failing to find that the respondent engaged in professional misconduct when filing his superior court motion to remove and sanction the GAL. The committee alleges that the respondent filed

a false affidavit in support of his motion. In his affidavit, the respondent asserted that during his meeting with the GAL on October 10, 1992, a man came to the back door of the GAL's office and spoke briefly with her about dinner plans. Once the man left, the respondent allegedly asked the GAL to identify the man at the door, and she replied, "Mike Van[a]skie." The respondent asserted that he was rendered "speechless and wondering," and thus moments later, repeated the question. He claimed that this time the GAL responded, "my husband." According to the respondent, when he noted the inconsistent answer, the GAL "changed the subject." In his motion to remove the GAL, the respondent questioned whether she and Dr. Vanaskie had an improper relationship that prejudiced her objectivity in the case. At the hearing before the referee, the GAL acknowledged that her husband interrupted the October 10 meeting and the two had discussed dinner plans. She denied identifying the visitor as "Mike Vanaskie."

The referee concluded that the episode "was either a misunderstanding on the part of [the respondent], or an invention by him so bizarre as to defy reason," and ultimately "believ[ed] the former rather than the latter." Therefore, the referee found that the committee failed to demonstrate by clear and convincing evidence that a violation had occurred. When reviewing the referee's findings, we "determine whether a reasonable person could have reached the same decision as the referee on the basis of the evidence before [the referee]." *Basbanes' Case*, 141 N.H. 1, 4, 676 A.2d 93, 95 (1996).

We are troubled by the timing of the respondent's motion to remove the GAL. The record demonstrates that he first raised a concern about a professional impropriety in January 1993, approximately three months after the October 10 meeting and after the GAL issued recommendations contrary to his personal interests and the court foreclosed access to his son. The record reveals that Dr. Vanaskie was not selected to perform family counseling until late October or early November 1992, and that the respondent voiced absolutely no concern at the time of the appointment. Had the GAL actually identified "Mike Vanaskie" as the visitor during the October 10 meeting, it is curious that the respondent failed to raise the question of an inappropriate relationship at the time Dr. Vanaskie was appointed. The respondent offers no explanation for waiting until January 1993 to raise the possible professional impropriety, even when repeatedly and directly questioned on cross-examination.

The respondent's recitation of the October 10 office visit, viewed in the context of surrounding and ongoing events, strongly

suggests that he fabricated the story to undermine the GAL's continued influence in the case, especially after she had made, and the court accepted, recommendations against his personal interests. While we may have reached a different conclusion than the referee, we cannot say that no reasonable person could have determined that the respondent and the GAL had a misunderstanding of events. The record demonstrates that the respondent likely made a strategic decision to wait to raise the possible professional impropriety until he perceived it to be beneficial to him. The evidence does not conclusively establish, however, to the exclusion of a reasonable contrary view, that he was untruthful about his version of events, and our role does not include resifting the evidence to render new factual findings. Accordingly, we conclude that the record supports the referee's finding that the committee failed to demonstrate by clear and convincing evidence that the respondent committed professional malfeasance when filing the superior court pleading.

### III

We next consider the respondent's challenge to the referee's finding that he violated Rules 3.1, 3.3(a)(1), 3.3(a)(3), and 8.4(a) when pursuing his district court petition. In his petition, the respondent claimed, *inter alia,* that his son was

> a neglected child [in that] he has been abondoned [*sic*] by his mother, is without proper parental care or control, sustenance and education as required by law or control necessary for his physical, mental, or emotional health and he has suffered or is likely to suffer serious impairment; and the deprivation is not due primarily to the lack of financial means of Barbara Buck and Barbara Buck is unable to discharge her responsibilities to and for [her son] because of her mental incapacity.

Attached to the petition were several affidavits signed by the respondent containing numerous allegations against Buck and Kimball. Following a hearing on the merits, the referee concluded, based on clear and convincing evidence, that the respondent violated Rules 3.1, 3.3(a)(1), 3.3(a)(3), and 8.4(a) when pursuing the petition based on the allegations in the attached affidavits. Although the referee observed that the respondent's assertions may not have constituted "out and out lie[s]," he believed they were "nearer to fiction than fact" and generally "outrageous." He concluded that "what truth lay in the substance of these matters is so expanded by

hyperbole as to become a sham." The respondent disputes these findings, which he alleges are not supported by the record.

Rule 3.1 prohibits a lawyer from "bring[ing] or defend[ing] a proceeding, or assert[ing] or controvert[ing] an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law." Rule 3.3(a)(1) prohibits a lawyer from "knowingly . . . mak[ing] a false statement of material fact or law to a tribunal," and Rule 3.3(a)(3) prohibits a lawyer from "knowingly . . . offer[ing] evidence that the lawyer knows to be false." Finally, Rule 8.4(a) states that "[i]t is professional misconduct for a lawyer to . . . violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another." We are also mindful of the statutory obligation to report suspected child abuse and neglect under the Child Protection Act. RSA 169-C:29 (1994). Despite this obligation, we conclude that the referee's finding of misconduct is supported by the record.

First, the respondent accused Buck of abandoning their son on August 28, 1992. In particular, he alleged:

> On 08-28-92 Barbara Buck abandoned [the son] at his father's house after [the son] stated to his mother that he wanted to live with his father. Barbara Buck provided no support, no clothes nor school supplies whatsoever for [her son]. Barbara Buck did not go to pick [her son] up.
>
> Barbara Buck did not pick [her son] up, request that [her son] be returned to her nor request in any way, that [her son] be returned to her custody in any way whatsoever until 12-20-92.
>
> On 09-05-92 Barbara Buck stated to [her son] I will not force you to come with me, I will let you live with your father.

(Paragraph numbers omitted.)

Essentially, the respondent's purported good faith basis for asserting abandonment was Buck's alleged failure to retrieve the son on August 28, 1992, and to provide the respondent with the son's personal belongings. His testimony reveals, however, that he believed that Buck did not retrieve either of the children on August 28 because she was acquiescing to their stated desire to reside with him. Indeed, the respondent's failure to assert abandonment in his petition to modify custody, filed just two months after the August

1992 episode, belies any claim that he exercised good faith in asserting abandonment in his January 1993 petition. The respondent acknowledged that Buck contacted the children at least twice during the week following August 28, and even arranged to visit them the following weekend. Notably, the respondent omitted these facts from his supporting affidavit. Further, the respondent alleged that Buck did not pursue resumption of physical custody until December 20, 1992, despite the existence of the court's October 29, 1992, order that the children be returned to their mother no later than the beginning of their spring semester at school. The respondent made no mention of the court's order in his petition.

We conclude that the record amply supports the referee's finding that the respondent's pursuit of the district court petition based in part on his representation that his ex-wife abandoned her children within the meaning of the abuse and neglect statute, *see* RSA 169-C:3, I (1994), violated Rules 3.1, 3.3(a)(1), 3.3(a)(3), and 8.4(a).

Second, the respondent claimed that Buck was unable to discharge her duties as a mother because of her "mental incapacity." He attested that "Barbara Buck because of her mental health problems is incapable of appropriately parenting [her son]," and that

> Barbara Buck has a long and extensive mental health record including ongoing weekly therapy sessions on and off for the last 8 years with De De Souza-sp, raising serious questions about her ability to parent.

> Barbara Buck in the past reported hallucinations to [her daughter's] pediatrician . . . . Barbara Buck may be reporting ongoing hallucinations with her current therapist.

(Paragraph numbers omitted.)

■ The record demonstrates that the respondent's claim that Buck had a "long and extensive mental health record" to justify his allegation that she had "mental health problems" or a "mental incapacity" greatly exaggerates the facts known to him. He testified that Buck sought therapy in 1984 and 1985 after their divorce, occasionally accompanied her fiance to his therapy sessions, and again sought therapy for herself during 1992 and 1993 but acknowledged that he had no information about the nature of Buck's therapy. Further, the respondent's allegations that Buck had "mental health problems," reported past "hallucinations," and "may be reporting ongoing hallucinations with her current therapist," are gross embellishments on the truth. The respondent testified that his

sole basis for making these allegations was an event which had occurred thirteen years earlier. Specifically, he asserted that in 1980, Buck told him that she had seen a four-inch worm exit and reenter their daughter's ear. While the respondent reported this event as a hallucination to the district court, medical records support the finding that the daughter was treated for having an adult male "ascaris lumbricoides," a type of worm. More importantly, even assuming the 1980 event was a hallucination, it was so dated that it cannot serve as a good faith basis for allegations in January 1993 that Buck had "mental health problems" or "may be reporting ongoing hallucinations." The respondent's failure to describe this event in his supporting affidavit demonstrates that he knew the allegations lacked a sound factual predicate. Further, the respondent never raised any concern about Buck's mental capacity to rear the children in any superior court proceedings involving custody and, in fact, told the GAL in October 1992 that he thought Buck was a "good mother." Such conduct and affirmative statements belie the legitimacy of the district court allegations. Accordingly, we hold that the record amply supports the referee's finding that the respondent violated Rules 3.1, 3.3(a)(1), 3.3(a)(3), and 8.4(a) when pursuing the abuse and neglect petition.

The respondent contends that we must reject the referee's finding that he violated Rules 3.3(a)(1) and 3.3(a)(3) because the referee failed to find that the respondent knowingly made misrepresentations of fact or law and submitted false evidence. To support his argument, the respondent points to the referee's statements that the allegations in the petition were "nearer to fiction than fact" and did not "fall to the level of . . . out and out lie[s]." The referee found, however, that "what truth lay in the substance of [the allegations] is so expanded by hyperbole as to become a sham," and concluded that the respondent violated "Rule 3.[3](a)(1) by making a false statement of material fact or law to a tribunal" and "Rule 3.3(a)(3) by offering evidence that he knew to be false." These findings are supported by a record that reveals that the respondent knowingly exaggerated facts and omitted material detail regarding the events underlying his allegations to a point of perverting the truth. Claiming Buck had abandoned her children and suffered a mental incapacity are serious allegations that should not have been made lightly. The respondent practiced law for two decades and handled numerous mental health and abuse and neglect matters. Thus, he was familiar with the triggering language which would likely cause the district court concern, and chose to distort the true nature of the material underlying events. The circumstances of this

case amply support the finding that the respondent knowingly made a false statement of material fact or law to the district court and offered evidence through his affidavits that he knew to be false.

■ The respondent also argues that the referee impermissibly expanded the scope of the committee's petition for disbarment, which asserted the falsity of only one of the affidavits attached to the district court petition. The challenged affidavit contains the respondent's abandonment allegation. The affidavit also includes the respondent's representation that Buck had "mental health problems" preventing her from properly parenting their son. We conclude that the referee did not improperly expand the scope of the formal complaint by reviewing the respondent's allegations that Buck (1) had a "mental incapacity," (2) had "a long and extensive mental health record," (3) suffered "hallucinations," and (4) "may be reporting ongoing hallucinations" because there is a clear nexus between these allegations and his representation that Buck had "mental health problems." With respect to the additional allegations reviewed by the referee, any expansion of the disbarment petition is of no consequence because we rely solely on the misconduct involving the abandonment and mental capacity allegations to sanction the respondent.

We reject the respondent's argument that the referee applied a preponderance of the evidence standard when finding that he committed professional misconduct because the referee expressly stated that he found that the respondent violated the Rules "by clear and convincing evidence." Finally, we need not determine whether the referee properly prevented the son from testifying. The son's affidavit, submitted to outline his intended testimony, does not provide support for the respondent's abandonment and mental health allegations.

IV

■ We turn finally to the issue of sanctions. When crafting an appropriate sanction for attorney misconduct, our focus is not punishment but protecting the public, maintaining public confidence in the bar, preserving the integrity of the legal profession, and preventing similar misconduct in the future. *Basbanes' Case*, 141 N.H. at 6, 676 A.2d at 96. We consider "the severity of the misconduct and the mitigating circumstances disclosed by the record." *Id.* "Although our role in reviewing the referee's factual findings is limited, we retain the ultimate authority to determine the appropriate sanction for violation of the Rules." *Cohen's Case*, 143 N.H. 169, 171, 723 A.2d 937, 938-39 (1998).

The respondent made knowing misrepresentations in the abuse and neglect petition and submitted it to the district court for the illegitimate purpose of harassing and injuring another. This misconduct is serious and serves to undermine the core principles of ethical lawyering and the lawyer's role as an officer of the court. A license to practice law is a special privilege requiring vigilant observance of the Rules of Professional Conduct. When a lawyer misuses the process or cleverly avoids candid disclosure to a tribunal, that lawyer threatens the very bedrock of the judicial system. Lawyering involves a public trust and requires an unswerving allegiance to honesty and integrity. While the respondent may have been acting in errant ways out of fear of losing his children, thus placing his malfeasance in a more sympathetic context, his conduct fell below what the profession and the public have a right to expect.

Further, we are troubled by the respondent's conduct throughout the hearing before the referee. He repeatedly engaged in semantical word play to explain his representations in the district court petition that he knew lacked a good faith basis. For example, when explaining his abandonment claim, the following colloquy occurred during cross-examination:

Q   [Y]ou believe you were perfectly within the Professional Conduct Rules for Candor by telling the Henniker District Court in an Abuse and Neglect Petition that this was abandonment?

A   Well, if you look up in the dictionary "abandoned" that is to leave without support or provision from her. She left without any support from her or provision from her, or even communication from her for a number of days. Maybe that is a harsh word, and maybe you would have liked me to use a lighter word. That is the word I picked . . . .

The respondent acknowledged, however, that he would not have advised a client facing similar circumstances to file an abuse and neglect petition alleging abandonment. He continued his gamesmanship in order to avoid responding to the committee's exacting inquiries on cross-examination. The following colloquy provides an example:

Q   Is it a coincidence that you [chose] to use words like, "mental health problems" and "hallucinations" within a week or so after the marital master . . . ordered Barbara Buck to have custody of your children, [and issued] the No Contact Order for you. Is that just a coincidence, sir?

A    Coincidence is very ambiguous. Coincidence for me or them or
     a third party, relative to what time? That there is a pure
     coincidence and there is coincidence in the eyes of the
     beholder. I don't know exactly what you are trying to ask.
     Please ask a simpler question.

Engaging in semantical gamesmanship hardly illustrates an intent
to cooperate in a process that the respondent acknowledges deter-
mines "his livelihood and his integrity." *See Nardi's Case*, 142 N.H.
602, 608, 705 A.2d 1199, 1202 (1998) (respondent's cooperation in
process may serve as mitigating factor only when cooperation is
total and complete).

The respondent advances as mitigating factors that he was a *pro
se* litigant in "explosive" post-divorce proceedings involving the
custody of his children. The record demonstrates, however, that he
was represented by counsel during the relevant time period but
chose to pursue the errant pleadings in an individual capacity.
Further, his contention that his "responses to the no contact order
were appropriate" raises a question as to the likelihood that he
would modify his conduct in the future. Indeed, when addressing
this court at oral argument, the respondent affirmed that he
"reported everything to the court as best and as clearly and as
accurately as [he] could," and insisted that while the judicial
referee, the marital master, and the GAL may have erred, he had
done nothing wrong. The evidentiary hearing before the referee
occurred approximately six years after the challenged misconduct.
It is disturbing that after having had a lengthy period of time to
reflect on his behavior, the respondent nonetheless defends the
absolute truth of his allegations.

■ Nevertheless, we conclude that disbarment, the sanction the
committee pursues, is not appropriate in this case. The respondent
faces professional discipline for the first time in his legal career,
which has spanned two decades. Further, the committee does not
allege that the respondent has engaged in professional misconduct
in the seven years since the malfeasance before us. In addition, the
violations found by the referee and affirmed in this opinion occurred
in a single event. *Cf. Basbanes' Case*, 141 N.H. at 8, 676 A.2d at 97
(continuing course of dishonesty contributed to disbarment sanc-
tion); *Astles' Case*, 134 N.H. 602, 606, 594 A.2d 167, 170 (1991)
(same). Accordingly, we are satisfied that a suspension of one year
for the respondent's misconduct comports with the underlying goals
for imposing professional discipline.

█ Finally, we find that the respondent's misconduct warrants the assessment of costs incurred by the committee in pursuing this matter. *See* SUP. CT. R. 37(16). The costs, however, should be properly apportioned, considering that the committee was successful on only a small portion of the more than forty violations it alleged. We reject the respondent's request for costs. While the committee unsuccessfully pursued a multitude of alleged violations against the respondent, we are not convinced that they were frivolous. Accordingly, we order the respondent suspended from the practice of law for one year and remand to the referee to determine the costs awarded. The respondent shall have the right to resume the practice of law, after the expiration of the suspension period, upon compliance with all the terms and conditions of this order and pursuant to the procedure set forth in Supreme Court Rule 37(12) regarding reinstatement. *See* SUP. CT. R. 37(2)(f) (redesignated as 37(2)(i) effective April 1, 2000).

*So ordered.*

NADEAU, J., did not sit; the others concurred.