Cin-Doo v. 7-Eleven                      04-CV-050-SM  04/06/05

UNITED STATES DISTRICT COURT

                      DISTRICT OF NEW HAMPSHIRE


Cin-Doo, Inc.,
      Plaintiff

      v.                                  Civil No. 04-cv-50-SM
                                          Opinion No. 2005 DNH 058
7-Eleven, Inc.,
      Defendant


                          **O R D E R**


      Cin-Doo, a 7-Eleven franchisee, has sued 7-Eleven in four

counts seeking damages and injunctive relief for, among other

things, 7-Eleven's failure to rebuild Cin-Doo's leased 7-Eleven

store after having previously stated that it would do so.  Before

the court is 7-Eleven's motion for summary judgment.  Cin-Doo

objects.  For the reasons given, 7-Eleven's motion for summary

judgment is denied.



                  **Summary Judgment Standard**

      Summary judgment is appropriate when the record reveals "no

genuine issue as to any material fact and . . . the moving party

is entitled to a judgment as a matter of law."  FED. R. CIV. P.

56(c).  "The role of summary judgment is to pierce the

boilerplate of the pleadings and provide a means for prompt disposition of cases in which no trial-worthy issue exists." Quinn v. City of Boston, 325 F.3d 18, 28 (1st Cir. 2003) (citing Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)). When ruling on a party's motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 37 (1st Cir. 2003) (citing Rivera v. P.R. Aqueduct & Sewers Auth., 331 F.3d 183, 185 (1st Cir. 2003)).


## Background

Cin-Doo owns and operates a 7-Eleven franchise at 37 Nashua Road, Londonderry, New Hampshire, pursuant to a franchise agreement dated December 20, 1996. (Pl.'s Obj. to Summ. J, Ex. A (Tibert Aff.) ¶ 2.) Jack Tibert is the president of Cin-Doo. (Tibert Aff. ¶ 1.) Until approximately 2001 – the record is not clear on this point – Tibert and his wife also owned an interest in another 7-Eleven franchise located in Litchfield, New Hampshire. (Tibert Aff. ¶ 58.) The building in which Cin-Doo operates its Londonderry 7-Eleven, and the five-acre parcel of

real estate on which the building stands, are owned by 7-Eleven. (Tibert Aff. ¶ 5.)

The penultimate paragraph of the franchise agreement provides, in boldface type:

> **Complete Agreement. This Agreement, any other agreements specified in Exhibit D, and the Exhibits, Amendments, and Addenda (which are incorporated herein by this reference and made a part of this Agreement) contain all Agreements between Franchisee and 7-Eleven and cover their entire relationship concerning the Store, all prior or contemporaneous promises, representations, agreements, or understandings being expressly merged and superseded. No Agent or Employee of 7-Eleven is authorized to make any modification, addition, or amendment to or waiver of this Agreement unless in writing and executed by an Assistant Secretary of 7-Eleven. . . .**

(Tibert Aff., Ex. 1 ¶ 34.) Exhibit A of the franchise agreement provides that "FRANCHISEE agrees that 7-ELEVEN may at any time remodel the Store in accordance with one of 7-ELEVEN's remodel programs." (Tibert Aff., Ex. 1, Ex. A.)

In 1999, one or more 7-Eleven officials spoke with Tibert about the possibility of updating Cin-Doo's store and constructing an addition. (Tibert Aff. ¶ 11.) By October 2000,

3

7-Eleven had decided to completely reconstruct the store rather than just updating it.  (Tibert Aff. ¶ 12.)  Tibert opposed that idea and informed 7-Eleven of his opinion.  (Tibert Aff. ¶¶ 12-13.)  In Tibert's words:

> In late 2000, my wife and I had a telephone conference with 7-Eleven Market Manager, Paul Donohoe, and 7-Eleven Vice-President / Assistant Secretary, Frank Crivello.
>
> During that telephone conference, Paul Donohoe and Frank Crivello told us about 7-Eleven's reconstruction plans.
>
> They told us that reconstruction was what 7-Eleven corporate wanted to do and that we needed to support the company.
>
> 7-Eleven, acting through Paul Donohoe and Frank Crivello, convinced me that reconstruction of the store made sense for the site because it would provide a state of the art building, gas pumps and layout.
>
> After my discussions with Paul Donohoe and Frank Crivello, I supported the reconstruction plans.

(Tibert Aff. ¶¶ 15-19.)


At some point in 2001, construction was begun on a Home Depot store located several hundred yards down Gilcreast Road from Cin-Doo's 7-Eleven store.  (Tibert Aff. ¶ 20.)  Tibert expressed concerns to 7-Eleven that the new Home Depot store, and

4

associated changes to Gilcreast Road, would cause traffic and accessibility problems for his store. (Tibert Aff. ¶ 23.) 7-Eleven officials told Tibert not to worry, because those problems would be resolved by the planned reconstruction of his store. (Tibert Aff. ¶ 24.) In July 2001, 7-Eleven provided Cin-Doo with engineering drawings related to the proposed reconstruction, as well as post-construction financial projections of Cin-Doo's potential earnings from the new store. (Tibert Aff. ¶¶ 25, 27.) 7-Eleven also represented that construction would take approximately ninety days, and would begin as soon as 7-Eleven received the necessary local permits and approvals. (Tibert Aff. ¶ 29.)

In September of 2001, 7-Eleven's senior real-estate representative, Don Caren, told Tibert and his wife that the reconstruction of their store was a 2002 project. (Tibert Aff. ¶ 41.) At a meeting in December of 2001, Caren's supervisor, Ken Barnes, assured the Tiberts that the reconstruction was going to happen. (Tibert Aff. ¶ 43.) In 2002, the nearby Home Depot construction project was begun. (Tibert Aff. ¶ 59.) Roadway reconstruction undertaken as a part of the Home Depot project

diminished access to Cin-Doo's 7-Eleven, and its business suffered as a consequence. (Tibert Aff. ¶ 61.)

Despite having told Tibert that it would reconstruct his store, 7-Eleven has never done so. (Tibert Aff. ¶ 62.) In June 2004, Tibert asked the president and CEO of 7-Eleven, Jim Keyes, about its failure to follow through on its previously expressed intention to reconstruct the Londonderry store, and Keyes replied: "We made a mistake." (Tibert Aff. ¶ 65.)

Back in September of 2001, Tibert was informed that someone in 7-Eleven's corporate office in Dallas had agreed to give Home Depot a portion of the real estate on which Cin-Doo's store stands, to facilitate improvements to Gilcreast Road and its intersection with Nashua Road. (Tibert Aff. ¶ 57.) It is unclear precisely when Tibert learned of the real estate transfer, but he states that at the time of the transfer, he "took no action to stop or seek an injunction because [he] relied upon the explicit representations by 7-Eleven, Inc. that it was going to reconstruct [his] 7-Eleven store." (Tibert Aff. ¶ 52.) Furthermore, "[b]ased upon 7-Eleven's promises concerning the

reconstruction of the Londonderry store and the revenues expected from the new design, [Tibert and his wife] sold [their other] interest in the 7-Eleven store in Litchfield, New Hampshire for less than its market value." (Tibert Aff. ¶ 58.)

Based upon the foregoing, Cin-Doo filed suit against 7-Eleven, seeking damages and injunctive relief. In Count I, plaintiff asserts a claim of breach of contract, based upon 7-Eleven's transfer of part of Cin-Doo's leasehold to Home Depot and 7-Eleven's failure to reconstruct Cin-Doo's store. Count II also asserts a claim for breach of contract, based upon 7-Eleven's failure to reconstruct the entrances and exits to the property, as well as its failure to remedy other deficiencies in the property regarding roofing, signage, and general deterioration.[1] Count III is captioned "Estoppel," and asserts that 7-Eleven is estopped from denying the existence of an agreement to reconstruct the store due to: (1) Cin-Doo's lack of opposition to the Home Depot construction project, or the transfer of part of the leasehold; and (2) the Tiberts' sale of

---

[1] Count II also asserts that 7-Eleven breached the implied covenant of good faith and fair dealing in seven enumerated ways.

7

their interests in the Litchfield 7-Eleven.  Count V – there is no Count IV in the complaint – is Cin-Doo's request for preliminary and permanent injunctive relief.

## Discussion

7-Eleven moves for summary judgment, arguing that it is not liable for breach of contract because it entered into no enforceable agreement to reconstruct the store operated by Cin-Doo.  7-Eleven's argument rests upon paragraph 34 of the franchise agreement (the integration/no-oral-modification provision quoted above) and the lack of any writing memorializing the promise Cin-Doo seeks to enforce.  Defendant does not, however, address plaintiff's estoppel argument, nor does it address any of the other acts which, in Cin-Doo's view, constituted breaches of the franchise agreement.  Cin-Doo counters by arguing that: (1) the promise to reconstruct its store was not a modification or amendment of the franchise agreement but was, instead, a separate oral agreement between itself and 7-Eleven; (2) the promise to reconstruct was made with either the actual or apparent authority of 7-Eleven; (3) 7-Eleven waived the provisions of paragraph 34; and (4) 7-Eleven is

8

estopped from denying the existence of an enforceable agreement to reconstruct Cin-Doo's store.

This is, to be sure, a somewhat curious breach of contract action. Plainly, the promise Cin-Doo seeks to enforce is not one for which it bargained. According to Tibert's affidavit, 7-Eleven initially announced its reconstruction plan – as it was entitled to do under the franchise agreement – and pressed that plan in the face of the Tiberts' objections. If anything, the object of Cin-Doo's initial bargaining was to convince 7-Eleven not to reconstruct its store, and, instead, to implement a less intrusive remodeling plan. So, rather than being something Cin-Doo bargained for, the proposed reconstruction was something to which Cin-Doo acquiesced. (Of course, under the franchise agreement, Cin-Doo's acquiescence was immaterial; 7-Eleven had the contractual right to implement, or not implement, any [reasonable] remodeling plan it chose.)

However, it does not necessarily follow, from the fact that Cin-Doo did not bargain for 7-Eleven's agreement to reconstruct the store, that 7-Eleven is not bound by its representations that

it would do so.  Specifically, 7-Eleven's statements might prove enforceable under the theory of promissory estoppel.  According to the Restatement, which the New Hampshire Supreme Court generally considers authoritative in this area of the law, see Marbucco Corp. v. City of Manchester, 137 N.H. 629, 633 (1993),

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.  The remedy for breach may be limited as justice requires.

RESTATEMENT (SECOND) OF CONTRACTS § 90(1) (1981).  Because the undisputed facts, viewed in the light most favorable to Cin-Doo, could, arguably, support a finding that an enforceable promise arose by virtue of estoppel (based upon the Tiberts' act of selling their interest in the Litchfield store, and their forbearance from challenging the Home Depot construction project), and because defendant does not address plaintiff's estoppel theory, defendant cannot be found to be entitled to summary judgment as a matter of law.

10

As noted, defendant's motion for summary judgment relies exclusively upon paragraph 34 of the franchise agreement, the integration/no-oral-modification provision.  However,

> [p]arties to a contract can not, even by an express provision in that contract, deprive themselves of the power to alter or vary or discharge it by subsequent agreement.  An express provision in a written contract that no rescission or variation shall be valid unless it too is in writing is ineffective to invalidate a subsequent oral agreement to the contrary.

Prime Fin. Group, Inc. v. Masters, 141 N.H. 33, 37 (1996).  While an "in-writing clause" must be overcome by the factfinder's determination that the parties intended to waive it, id. (citing C.I.T. Corp. v. Jonnet, 214 A.2d 620, 622 (Pa. 1965); Menard & Co. Masonry Bldg. Contractors v. Marshall Bldg. Sys., 539 A.2d 523, 526-27 (R.I. 1988)), "[t]he waiver of the in-writing clause . . . may itself be implied from the conduct of the parties," id. (citing Freeman v. Stanbern Constr. Co., 106 A.2d 50, 54-55 (Md. 1954); Menard & Co., 539 A.2d at 527).  The foregoing principle would appear particularly relevant where, as here, plaintiff relies upon an estoppel theory, to be proven, in part, by evidence of plaintiff's conduct in response to 7-Eleven's statements about reconstructing Cin-Doo's store.  It is not a

11

particularly strong or well-supported theory, perhaps, but on this undeveloped record, it is sufficient to avoid summary judgment at this juncture.

## Conclusion

For the reasons given, 7-Eleven's motion for summary judgment (document no. 20) is denied.

**SO ORDERED.**

Steven J. McAuliffe
Chief Judge

April 6, 2005

cc:  Joshua L. Gordon, Esq.
     Gordon J. MacDonald, Esq.
     Arthur L. Pressman, Esq.
     Rory A. Valas, Esq.

12