Original
No. LD-97-009

## Feld's Case

Argued: September 19, 2002
Opinion Issued: December 31, 2002

*Griffith & Associates, PLLC,* of Wilton (*John P. Griffith* on the brief and orally), for the committee on professional conduct.

*Kirkpatrick & Lockhart,* of Boston (*Arnold R. Rosenfeld* and *John M. Edwards* on the brief, and *Mr. Rosenfeld* orally), for the respondent.

DUGGAN, J. On June 19, 1997, the Supreme Court Committee on Professional Conduct (committee) filed a petition with this court requesting that the respondent, Steven E. Feld, be disbarred from the practice of law. On September 3, 1997, we referred the petition to a Judicial Referee (*Temple,* J.) to conduct a hearing on the alleged violations. The referee found that the respondent violated New Hampshire Rules of Professional Conduct 3.4 and 8.4(a) and recommended a public reprimand.

The underlying litigation in this matter was the subject of our opinion in *Bussiere v. Roberge,* 142 N.H. 905 (1998). The relevant facts are as follows. In 1974, Emile Bussiere and several partners completed construction of a 76-unit apartment building in Manchester. In 1984, Bussiere sold the building to Stephen Bronstein, who financed the purchase with a bank loan secured by a mortgage. Under the terms of the purchase, Bussiere and an associate retained a "paid-up" leasehold in a two-story apartment in the building, in contemplation that the building would be converted into condominiums. A series of documents, including the bank's recorded mortgage and several unrecorded letters, indicated that the bank's mortgage was subject to the leases of Bussiere and his associate even in the event of a default on the mortgage. We eventually affirmed a ruling by the superior court that these documents gave Bussiere "the right to exclusive possession and control" of the apartment against all holders of the mortgage. *Bussiere,* 142 N.H. at 906.

In December of 1993, Bronstein defaulted on the bank's loan. Some time afterwards, members of the Roberge family became interested in purchasing the mortgage. Carolyn Roberge (Ms. Roberge) retained the services of the respondent, Steven Feld, to complete title work and analyze the property interest held by Bussiere and his partner. On July 18, 1994, Ms. Roberge signed an option agreement with the bank to purchase the mortgage.

Bussiere became aware of the Roberges' interest in the property. On July 28, 1994, Bussiere faxed a letter (the July 28 letter) to Ms. Roberge describing his claim to the . property and enclosed the unrecorded documents relating to his lease. Ms. Roberge subsequently showed this letter to Feld. Bussiere never received a reply from either Ms. Roberge or Feld. Bussiere sent a second letter to the Roberges on September 1 in which he repeated his claims and alluded to the unrecorded documents, although he did not enclose them. Despite these letters, Ms. Roberge and her mother, by means of a newly-formed corporation (Fifty-Five Associates) of which they were the only directors, purchased the mortgage on September 7, 1994. Ms. Roberge's father, Roland Roberge (Mr. Roberge), had no role in the corporation, but gave a "substantial" amount of money to his wife to be used for the purchase and assisted Ms. Roberge throughout the transaction.

In 1995, Feld commenced eviction proceedings against Bussiere. Bussiere responded with an equity action in superior court, naming Ms. Roberge and her father Roland Roberge, among others, as defendants. During the discovery process, Bussiere, under the authority of Superior Court Rule 35(a), directed a series of depositions, interrogatories and requests for admission to the Roberges. Bussiere's inquiries concerned two major topics: (1) the financial involvement of each defendant, particularly Mr. Roberge, in the purchase of the real estate; and (2) the defendants' knowledge of Bussiere's claim prior to the purchase, particularly regarding their receipt of his July 28 letter with its attachments. Feld represented all of the defendants throughout the discovery phase, and drafted or reviewed all of their responses to interrogatories and requests for admission. The responses to these discovery requests later became the basis of the professional conduct complaint filed by Bussiere against Feld.

The committee investigated the allegations in the complaint, held an evidentiary hearing, and found that Feld "orchestrated, assisted, counseled and tolerated the formulation of inaccurate and incomplete sworn responses that he knew were inaccurate" in violation of New Hampshire Rules of Professional Conduct 3.4 and 8.4. We appointed a Judicial Referee (*Temple*, J.), who conducted a *de novo* evidentiary hearing and ruled that Feld's conduct violated Rules 3.4 and 8.4. In *Feld's Case*, 144 N.H. 131 (1999), we adopted the referee's findings and recommended sanction.

After the publication of that decision, it was alleged that a former justice of this court who was recused from the case improperly offered his opinions regarding the sanction imposed. The respondent, citing these allegations, petitioned this court to vacate both the opinion of this court

and the referee's report. On December 4, 2001, we issued an order that granted the respondent's motion to vacate our opinion, denied his motion to vacate the referee's report and requested that the parties submit new briefs for a new oral argument before a new panel of judges.

The respondent raises two issues before us. First, he argues that the allegations of judicial impropriety demand an outright dismissal of the complaint against him. Second, he argues that his conduct during discovery did not constitute a violation of Rules 3.4 and 8.4. We address each issue in turn.

The respondent first argues that the allegations of judicial impropriety require dismissal of his case on due process grounds. He argues that "the case has been irreparably tainted" by allegations of impropriety and that a "public perception of partiality permeates the proceeding." This is essentially the same argument the respondent advanced in his motion to vacate our earlier decision. We have already considered this matter by means of our December 4, 2001 order. Given that there is no allegation of judicial impropriety regarding the referee's report, and that none of the Justices involved in the first decision are sitting on this case, we decline to reconsider our order.

We thus turn to the merits of this case. Rule 3.4 of the New Hampshire Rules of Professional Conduct states, in pertinent part:

*Rule 3.4: Fairness to Opposing Party and Counsel*

A lawyer shall not:

. . . .

(b) falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law;

(c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists;

(d) in pretrial procedure, make a frivolous discovery request or fail to make reasonably diligent effort to comply with a legally proper discovery request by an opposing party.

The judicial referee, citing three particular incidents during the discovery process, found that Feld's actions violated Rules 3.4(b), 3.4(c) and 3.4(d). Our standard of review for the referee's factual findings in a lawyer discipline case is whether "a reasonable person could have reached the same decision as the referee." *Cohen's Case*, 143 N.H. 169, 171 (1998) (quotation omitted). However, we review *de novo* to determine whether the referee committed errors of law. *Cf. Lake Sunapee Protective Assoc. v.*

*N.H. Wetlands Bd.*, 133 N.H. 98, 106 (1990); 5 R. WIEBUSCH, NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 39.10, at 240 (2d ed. 1998).

At the outset, we note that the judicial referee throughout his report described Feld's violations as a "failure to correct the record" regarding the statements made by his clients. Feld argues that because New Hampshire has not adopted Model Rule of Professional Conduct 3.3(a)(2), which imposes a duty to disclose facts to a tribunal in order "to avoid assisting a criminal or fraudulent act by the client," he has not violated the Rules of Professional Conduct in the manner described by the referee. *See* N.H. R. PROF. CONDUCT 3.3 New Hampshire Comments. Despite the referee's choice of words, however, we hold that the incidents detailed in the report clearly involve the explicit text of Rule 3.4. Thus, we need not reach the issue of whether Feld had a subsequent duty to correct the record.

The first incident occurred in response to Bussiere's November 6, 1995 request for admissions. Bussiere requested that Carolyn Roberge admit that certain documents, including his July 28 letter and the attached unrecorded mortgage letters, were complete and genuine. The response, reviewed by Feld, claimed that the letter "was never received by Carolyn M. Roberge." Feld, however, knew that this answer was false when he signed it, as Ms. Roberge had already shown Feld the July 28 letter along with the unrecorded documents.

The respondent claims that this response was a mistake. This claim, however, is belied by the fact that Feld provided other false answers regarding the July 28 letter. In response to a September 1995 interrogatory question in which Bussiere asked Ms. Roberge if she admitted the existence of his lease, Feld assisted in drafting the following response:

> No. See Memorandum of Law previously filed with the Court. A copy of Bussiere's lease was provided with the mortgage documents. Bussiere personally wrote that there were other documents prior to the closing of the sale on the mortgage. *None were ever provided. These are the sole documents that are known.*

(Emphasis added.)

Carolyn Roberge also provided numerous evasive answers regarding the July 28 letter during her deposition on October 11, 1995, at which Feld was present. Given the importance placed by Bussiere upon this line of inquiry, and Feld's repeated involvement with false answers, the record

does not support Feld's claim that his assistance with the response to the request for admission was inadvertent.

The respondent also argues that the answer did not prejudice Bussiere because "[t]he Roberges never denied they had received notice" of his claim. We have never held that lack of prejudice to an opposing party is a defense to a violation involving deceit upon the court or an opposing party. In *Kalil's Case*, 146 N.H. 466, 466-67 (2001), for example, we sanctioned a lawyer for lying to a court, even though his misstatement was corrected almost immediately and did not concern the material facts or issues of the litigation.

█ In any event, Bussiere's request for admission to Ms. Roberge did not ask generally whether the Roberges had notice of his claim, but specifically asked whether they had received his July 28 letter with its attached documents. Despite numerous attempts throughout the discovery process, Bussiere never received this confirmation. We thus agree with the referee that Feld violated Rule 3.4(b) by assisting his client in providing false testimony. In impeding Bussiere's interrogatory, Feld violated Superior Court Rule 35(b)(1), which entitles parties to all relevant, unprivileged information that they request during discovery. Feld thus also violated New Hampshire Rules of Professional Conduct 3.4(c) (prohibiting a lawyer from violating a rule of a tribunal) and 3.4(d) (failing "to make a reasonably diligent effort to comply with a legally proper discovery request"). *See also Mississippi Bar v. Land*, 653 So. 2d 899, 909 (Miss. 1994).

The second incident involves Roland Roberge's December 13, 1995 supplemental answers in response to a Bussiere interrogatory. Bussiere asked twenty-three questions relating to the purchase of the building, the roles of the defendants, Bussiere's lease, and the circumstances of his eviction. One question specifically asked Mr. Roberge to "[s]tate in full detail how each or any of the defendants obtained the financing to purchase the mortgage on the subject property." Feld reviewed and sent the following response to all twenty-three questions:

> As previously stated in my deposition and interrogatories I am neither an officer, director, employee, creditor, debtor, shareholder, "agent" or "owner" of either Fifty Five Associates, LTD. or H.T. Management Corporation. To the best of my knowledge all of the records are in the custody of my daughter at her business office in Portsmouth, New Hampshire. I do not possess, maintain, or have access to the corporate or financial books or records of either business. I have never personally seen the checkbook or business ledgers of either corporation. *I have*

*no further personal knowledge not learned through my legal counsel.*

(Emphasis added.)

█ When he reviewed this response, Feld knew at the very least that Mr. Roberge had transferred a large sum of money to his wife, the director of the purchasing corporation, for the purpose of buying the real estate. Thus, Feld knew when he drafted the responses that a disclaimer of any "personal knowledge" on the part of Mr. Roberge was false.

The respondent argues, however, that Feld cannot be held liable because the attorney general has decided not to prosecute Mr. Roberge for perjury. We disagree. First, perjury requires that a statement be "material" in addition to being false. *See* RSA 641:1(a) (1996). Rule 3.4(b) contains no materiality requirement. Nor do we see any reason to imply such a requirement in a discovery context, where a party has the right to acquire information that is not in and of itself material. *See* SUPER. CT. R. 35(b)(1). Second, violations of Rule 3.4(d) need not involve false statements. A pattern of evasive or non-responsive conduct, such as that demonstrated in the responses to the interrogatory, demonstrates a lawyer's failure "to make reasonably diligent effort to comply with a legally proper discovery request made by an opposing party." N.H. R. PROF. CONDUCT 3.4(d); *see State ex. rel. Okl. Bar Ass'n v. Lloyd*, 787 P.2d 855, 859-60 (Okl. 1990). We thus agree that Feld's assistance with Mr. Roberge's responses constituted a violation of Rules 3.4(b), 3.4(c) and 3.4(d).

The third incident concerns Feld's conduct at the deposition of Roland Roberge on October 11, 1995. Throughout the morning, Bussiere questioned Mr. Roberge repeatedly about his financial involvement with the purchase of the real estate. Mr. Roberge's answers were evasive and dilatory. The following exchange, in which Bussiere questioned Mr. Roberge, was typical:

Q: Now in the course of the transaction, sir, where that mortgage was acquired, did you speak to anyone about the terms and conditions of that acquisition?

A: I was aware that my daughter was interested in this mortgage in possession.

Mr. Bussiere: Would you kindly reread the question and see if we can get an answer?

The Witness: Can you also reread the answer?

(Whereupon, the previous question was read back by the reporter.)

Q: Do you understand the question, sir?

A: Yes, I do, sir.

Q: Would you answer it, please?

A: I was not a purchaser. I don't have any financial interest in acquiring the mortgage; I was not proposed to be an employee or a director or an officer and I like any normal father, I am interested in the things that my daughter does.

Mr. Bussiere: Would you reread the question?
(Whereupon, the previous question and answer were read back by the reporter.)

Q: Do you understand the question?

A: Yes, I do.

Q: Would you answer it, please?

A: I entered into no negotiations whatsoever on behalf of my daughter. I was not authorized to do so by her. My function is strictly that of a dad, a proud father. I have no legal ownership. I have no interest in making any investments in real estate. I am not an officer, director, trustee, or anything else here.

Mr. Bussiere: Would you read the question back please?
(Whereupon, the requested question was read back by the reporter.)

Q: Would you please answer the question?

A: I do not have, nor have I ever had the authority to discuss or negotiate the purchase of a mortgage for my daughter because I am not, I have just not been authorized to do that. I am not an employee of one of her corporations or a director, an officer; and I am not authorized to negotiate anything on her behalf.

Mr. Bussiere: Mr. Hayward, would you indicate that this is the fourth reading of the question and read it back, please?
(Whereupon, the requested question was read back by the reporter.)

Q: Would you please answer the question?

A: I am not an officer, director, trustee of any of my daughter's corporations. I am not authorized to negotiate on her behalf nor have I ever been. Wait a minute. I will take that back. Nor have I been in this transaction that you referred to here today.

Q: Now Mr. Roberge, I have had the question read five times and we can do that another five times, but it appears as if you do not want to tell me whether or not you did or did not, or whether or not you have forgotten whether you have discussed the terms and conditions of that acquisition with any human being. Are you willing to answer that question or unwilling?

A: With any human being? My daughter. A new nuance to that question has been brought in, the term with any human being.

Q: Well, we will strike that term and say with anyone. We will use anyone for that question.

A: With anyone?

Q: I can have the question reread for you, but I am satisfied, Mr. Roberge, if you just don't want to answer the question and we will move on to something else.

A: I never said that.

Q: Then I suggest we reread the question.

A: I can't tell you.

Q: Wait a minute. I am suggesting that we reread the question one more time. Mr. Hayward, would you please oblige?
(Whereupon, the requested question was read back by the reporter.)

The Witness: Yes, I spoke to my daughter.

During the lunch break, Mr. Roberge told Feld that he had transferred a substantial amount of money to his wife, a director of the purchasing corporation, to buy the real estate. After the deposition resumed, Bussiere specifically asked whether Mr. Roberge gave any money to Carolyn Roberge or the corporation involved in the purchase. Feld objected, stating that the information was protected by the attorney-client privilege, and Mr. Roberge did not answer the question.

█ The respondent argues that a protective order based upon Bussiere's prior representation of Mr. Roberge provided him with a reasonable basis to invoke the attorney-client privilege. The referee,

however, found that the objection "obviously went beyond any court-ordered protection arising out of an earlier representation." A review of the record supports the referee's finding. The witnesses at the hearing provided different accounts of what financial information, if any, Mr. Roberge had provided to Bussiere. All agreed, however, that the prior representation involving this alleged disclosure occurred in the early 1980s. Moreover, neither Feld nor Mr. Roberge demonstrated how the financial information allegedly given to Bussiere was privileged or explained the relationship between the prior representation and the current litigation. These facts demonstrate that Feld's invocation of the privilege was not legitimate, but rather a bad faith effort to impede Bussiere's discovery. Such conduct violates not only Rule 3.4(d), but also Rule 3.4(c), which requires a lawyer to obey the rules of a tribunal, including Superior Court Rule 35(b)(1), which requires compliance with legitimate discovery requests.

Our ruling that Feld has violated Rules 3.4(b), 3.4(c) and 3.4(d) also leads us to find a violation of Rule 8.4(a) (professional misconduct for an attorney to "violate or attempt to violate the Rules of Professional Conduct"). See *Farley's Case*, 147 N.H. 476, 476-77 (2002).

Having found that Feld violated the Rules of Professional Conduct, we next consider the appropriate sanction. Lawyer discipline is not intended to be punishment. *Welts' Case*, 136 N.H. 588, 592 (1993). Rather, "[t]he purpose of this court's disciplinary power is to protect the public, maintain public confidence in the bar, preserve the integrity of the legal profession, and prevent similar conduct in the future." *Cohen's Case*, 143 N.H. at 171-72 (quotation omitted). When deciding the sanction, we consider both the severity of the misconduct and mitigating circumstances. See *Nardi's Case*, 142 N.H. 602, 606 (1998). Although we defer to the referee's factual findings, "we retain the ultimate authority to determine the appropriate sanction for a violation of the Rules." *Cox's Case*, 148 N.H. 559, 564 (2002).

"Although we have not adopted the ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS, we look to them for guidance." *Id.* According to the relevant ABA Standard, "[S]uspension is appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a client or party, or interference or potential interference with a legal proceeding." ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS § 6.22 (1991). Reprimand is generally appropriate only when the conduct was negligent. *Id.* § 6.23. In this case, the record clearly establishes that Feld's multiple violations of Rule 3.4 were intentional, and that they caused potential, if not actual, injury to Bussiere's lawful pursuit of information during the discovery process. Feld's conduct, moreover, involved making false statements. We have held that "no single

transgression reflects more negatively on the legal profession than a lie." *Nardi's Case*, 142 N.H. at 606 (quotation omitted). We also note that Feld's misconduct was not related to a single incident, but involved separate ethical violations involving different clients occurring over a period of several months.

In recommending a sanction of reprimand instead of suspension, the referee found five mitigating factors. The first of these factors, the absence of a prior disciplinary record, was indisputably present. However, the PCC contests the referee's finding of four other factors, to wit: (1) Feld's cooperation with the PCC; (2) the absence of a dishonest motive; (3) Feld's good faith efforts to remedy the effects of his misconduct; and (4) Feld's remorse for his actions. *Cf.* ABA STANDARDS § 9.32. We consider the evidence and weight of each of these factors in turn.

■ First, the referee noted that Feld "cooperated with the professional conduct committee throughout its proceedings." After reviewing the record, we agree that Feld cooperated by responding to the PCC's inquiries and attending hearings, even though he did not admit to violating the rules. *Cf. Clark's Case*, 136 N.H. 497, 499 (1992) (respondent "failed to appropriately respond" to the committee's complaint). Because a lawyer has a professional duty to cooperate with a PCC investigation, however, we do not ascribe significant weight to this factor. *See id.*

■ Second, the referee found that "no dishonest motive has been shown" for Feld's conduct. We have found this factor in cases involving, for example, unintentional conduct or incompetence. *See, e.g., Farley's Case*, 147 N.H. at 476-77; *Welts' Case*, 136 N.H. at 590-93. Intentionally assisting in the promulgation of false answers is, however, inherently dishonest. Feld's claim that he acted in his clients' interests at most demonstrates that he lacked a selfish motive, but does not make his conduct any less dishonest. *See* ABA STANDARDS § 9.32(b) (distinguishing between dishonest and selfish motives). We thus cannot find this mitigating circumstance to be present.

■ We also disagree with the referee's finding that "good faith efforts were made to correct any inaccuracy." At most, the record demonstrates that Carolyn and Roland Roberge's testimony at the first trial included the information Feld had withheld from Bussiere during discovery. A good faith remedy for misconduct, however, must be timely to be mitigating. *See Welts' Case*, 136 N.H. at 593; ABA STANDARDS § 9.32(d). The disclosures in this case occurred months after the initial misconduct. Moreover, the trial testimony did not correct Feld's misconduct. Bussiere was entitled to obtain the information before, not during, the trial. *See* SUPER. CT. R.

35(b)(1). Feld's misconduct caused potential, if not actual, harm to Bussiere's ability to effectively prepare for trial. To correct his misconduct, Feld, at the very least, had to bring his misconduct to the attention of Bussiere or the court *before* the trial began.

■ Finally, we disagree with the referee's finding that Feld's remorse should be a mitigating circumstance. Feld "expressed sincere regret that he allowed himself to get caught up in the battlefield atmosphere in the litigation against Mr. Bussiere." He did not, however, admit that he violated the Rules of Professional Conduct. In cases involving dishonesty, a lawyer must admit to his professional misconduct to truly demonstrate remorse. *See, e.g., Kalil's Case*, 146 N.H. at 466-67. We can find no evidence that Feld has accepted responsibility for his ethical violations. We also note that the "battlefield atmosphere" alleged to exist during the litigation does not excuse Feld's misconduct. *See, e.g., Bruzga's Case*, 145 N.H. 62, 72 (2000).

■ We are aware of the significant delay involved in the final adjudication of this case. Yet because we find that most of the mitigating circumstances found by the referee are not present, we decline to impose the recommended sanction of a public reprimand. Instead, weighing the severity of Feld's misconduct against his lack of a prior disciplinary record, his cooperation, lack of a selfish motive, and the delay, we conclude that the respondent should be suspended from the practice of law for one year. This sanction is commensurate with the discipline we have imposed in cases involving intentional deceit during litigation. *See Bruzga's Case*, 145 N.H. at 72 (one year suspension); *but see Basbanes' Case*, 141 N.H. 1, 8 (1996) (disbarment); *Jones' Case*, 137 N.H. 351, 361 (1993) (disbarment). We also order Feld to reimburse the committee for that portion of the costs attributable to his misconduct. We remand the allocation of costs to the referee.

The respondent is hereby suspended from the practice of law for one year. The suspension shall begin thirty days from the date of this opinion, or upon issuance of a decision based upon any motions for rehearing or reconsideration, whichever is later. He shall have the right to resume the practice of law, after the expiration of the suspension period, upon compliance with all the terms and conditions of this order and pursuant to the procedure set forth in Supreme Court Rule 37(12) regarding reinstatement. *See* SUP. CT. R. 37(2)(j).

*So ordered.*

NADEAU, J., concurred; MURPHY, C.J., and SMITH, J., superior court justices, specially assigned under RSA 490:3, concurred.