Original
No. LD-2006-009

BOSSE'S CASE

Argued: February 21, 2007
Opinion Issued: April 4, 2007

*Landya B. McCafferty,* of Concord, on the brief and orally, for the attorney discipline office.

*Gallagher, Callahan & Gartrell, P.C.,* of Concord (*David A. Garfunkel* on the brief and orally), for the respondent.

DALIANIS, J. On November 13, 2006, the attorney discipline office (ADO) appealed the decision of the Supreme Court Professional Conduct Committee (PCC) to suspend the respondent, Leigh D. Bosse, from the practice of law in New Hampshire for six months. We order the respondent suspended from the practice of law in New Hampshire for two years.

I

The parties stipulated to the following: The respondent has been an attorney admitted to the practice of law in New Hampshire since 1975. At all material times, he was self-employed as both a real estate agent and an attorney. In February 2003, he wrote to landowners on a small lake in Hillsboro, informing them that he could "almost guarantee a quick sale" of their lots "for at least $10,000.00" to one of three builders with whom he was working. In response to this letter, the respondent received a telephone call from Raymond Grimard who expressed interest in selling his lot for $10,000.00. The respondent told Grimard that he would send him a listing packet and, if he could contact one of the builders identified in the letter, he would also send a purchase and sale agreement.

The next day, at the request of one of the builders, the respondent prepared a $10,000.00 offer to purchase Grimard's property. Also, at the builder's request, the respondent prepared a listing for the house to be constructed on Grimard's property and entered the listing into his office computer. The respondent then uploaded this information to the Northern New England Real Estate Network (NNEREN), which is the computerized multiple listing service for New Hampshire.

Two days after the respondent uploaded the listing to the NNEREN, James Boike, the administrator of the NNEREN, asked him for documents to verify the listing. The respondent attempted, unsuccessfully, to reach Grimard. Rather than tell Boike that he had uploaded the Grimard listing too soon, he signed Grimard's name to the exclusive listing

agreement and the purchase and sale agreement. Although the respondent expected Grimard to forward executed documents to him shortly thereafter, he signed Grimard's name without his consent or authorization. The respondent then forwarded the documents to Boike and falsely informed him that the purchase and sale agreement was "in effect."

Unbeknownst to the respondent, Grimard had decided not to list his property with the respondent and had listed his property with a different realtor. When the respondent discovered this, he wrote to Boike: "I don't know what's going on. Grimard now says he listed with [another realtor] for twice as much and I have withdrawn my agreement & listing."

The ADO originally charged the respondent with violating New Hampshire Rules of Professional Conduct (Rules) 8.4(a), (b) and (c). The parties eventually stipulated that the respondent's conduct violated Rules 8.4(a) and (c). The ADO did not pursue its charge under Rule 8.4(b), which makes it professional misconduct to commit a criminal act that reflects adversely upon the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects. For the purposes of this appeal, therefore, we accept the parties' stipulation that the respondent violated Rules 8.4(a) and (c).

█ Rule 8.4(a) makes it professional misconduct to violate the Rules. Rule 8.4(c) makes it professional misconduct for an attorney to engage in conduct involving dishonesty, fraud, deceit or misrepresentation. The respondent violated this rule when he signed Grimard's name to the exclusive listing agreement and purchase and sale agreement without Grimard's knowledge or consent, and forwarded these documents to the NNEREN so that Boike would believe that the respondent had secured Grimard's agreement to list his property with the respondent and to sell it to the builder. He also violated this rule when he falsely informed Boike that the purchase and sale agreement between Grimard and the builder was "in effect." When the respondent signed the documents and forwarded them to the NNEREN, he knew that he lacked Grimard's consent to sign them.

For the above misconduct, the ADO recommended disbarment and the respondent requested public censure. The PCC ordered the respondent suspended from the practice of law in New Hampshire for six months. The ADO moved for reconsideration, which the PCC denied, and this appeal followed.

## II

In attorney discipline matters, we retain ultimate authority to determine whether, upon the facts found, a violation of the rules governing attorney

conduct has occurred and, if so, the proper sanction. *Coddington's Case*, 155 N.H. 66, 67-68 (2007). In determining a sanction, we are mindful that the purpose of attorney discipline is to protect the public, maintain public confidence in the bar, preserve the integrity of the legal profession, and prevent similar conduct in the future; the purpose is not to inflict punishment. *Id.* at 68. We judge each attorney discipline case upon its own facts and circumstances, taking into account the severity of the misconduct and any mitigating circumstances appearing in the record. *Id.*

Although we have not adopted the American Bar Association's STANDARDS FOR IMPOSING LAWYER SANCTIONS (2005) (STANDARDS), we look to them for guidance. *Id.* The STANDARDS list the following factors for consideration in imposing sanctions: (a) the duty violated; (b) the lawyer's mental state; (c) the actual or potential injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors. STANDARDS, *supra* § 3.0; *Coddington's Case*, 155 N.H. at 68.

In applying these factors, we first categorize the respondent's misconduct and then identify the appropriate sanction. *Coddington's Case*, 155 N.H. at 68. We then consider the effect of any aggravating or mitigating factors on the ultimate sanction. *Id.*

Here, the respondent's misconduct involves failure to maintain personal integrity. STANDARDS, *supra* § 5.1. The STANDARDS provide that disbarment is generally proper, absent mitigating circumstances, when "a lawyer engages in any . . . intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice." *Id.* § 5.11.

The respondent's conduct involved "intentional . . . dishonesty, fraud, deceit [and/or] misrepresentation that seriously adversely reflects on [his] fitness to practice." *Id.* Even though he engaged in this conduct in his capacity as a real estate agent, his conduct adversely reflects upon his fitness to practice. "[T]he privilege of practicing law does not come without the concomitant responsibilities of truth, candor and honesty." *Basbanes' Case*, 141 N.H. 1, 7 (1996) (quotation omitted). "Lawyering involves a public trust and requires an unswerving allegiance to honesty and integrity." *Bruzga's Case*, 145 N.H. 62, 71 (2000). Accordingly, "it is the responsibility of every attorney at all times to be truthful." *Kalil's Case*, 146 N.H. 466, 467 (2001) (quotation omitted).

With respect to the respondent's mental state, the PCC found that he acted intentionally and deliberately. The STANDARDS define "[i]ntent" as the "conscious objective or purpose to accomplish a particular result." STANDARDS, *supra* at 9. The parties' stipulated facts establish that the respondent acted with a conscious objective or purpose to accomplish a particular result—inducing Boike to believe that he had secured Grimard's

agreement to list the property and sell it to the builder. We therefore uphold the PCC's determination that the respondent acted intentionally.

We next consider the actual or potential injury from the respondent's conduct. The STANDARDS define "[i]njury" as "harm to a client, the public, the legal system, or the profession which results from a lawyer's misconduct." *Id.* The PCC determined that the injury was "subjective in nature and not quantifiable," but that "[w]henever an attorney engages in ... deceit, ... the injury to the integrity of the New Hampshire Bar is substantial." We agree with the PCC that the injury to the integrity of the legal profession is substantial whenever an attorney engages in deceit. "[N]o single transgression reflects more negatively on the legal profession than a lie." *Kalil's Case*, 146 N.H. at 467 (quotation omitted).

There is no evidence, however, of any injury to Grimard. As the respondent aptly points out in his brief: "[The respondent] could not have compelled ... Grimard to sell his property based upon the documents ... and ... Grimard was not precluded from choosing to list his property with another realtor, which he did the same day that [the respondent] signed the documents." Nor is there any evidence of injury to the NNEREN.

We next consider the effect of mitigating or aggravating factors with respect to the sanction to be imposed. The parties agreed to the following mitigating factors: (1) the respondent's lack of a prior disciplinary record; (2) his cooperation during the proceedings, which included expressing remorse and admitting his misconduct; and (3) the loss of his real estate license. *See* STANDARDS, *supra* § 9.32(a), (e), (k), (l). The parties also agreed that the respondent's selfish or dishonest motive and his substantial experience in the practice of law were aggravating factors. *Id.* § 9.22(b), (i).

The ADO urges disbarment, despite the presence of four mitigating factors, the lack of injury to Grimard or the NNEREN, and the fact that the respondent engaged in an isolated instance of misconduct. Although "we have ordered disbarment for attorney misconduct involving dishonesty[,] [w]e have observed ... that those cases involved additional and repeated misconduct, including the respondents' failure to cooperate with the professional conduct committee." *O'Meara's Case*, 150 N.H. 157, 159 (2003) (quotation and citation omitted).

For instance, we disbarred the attorney in *Wolterbeek's Case*, 152 N.H. 710, 717 (2005), where, in addition to acquiring three mortgages and becoming the holder of a note owed by his client, the attorney engaged "in a course of deceitful conduct toward a client and a tribunal over a span of several years with the intent to benefit himself." Similarly, in *Astles' Case*, 134 N.H. 602, 604-05 (1991), we disbarred an attorney who forged his wife's signature on two mortgage applications; lied to a paralegal, who was

investigating one of the applications; forged a document that purported to give him his wife's power of attorney; and repeatedly lied to the PCC during its investigation. In that case, we observed that the attorney, having sought commercial financing for his home by committing fraud, compounded his misconduct by repeatedly lying about it. *Astles' Case*, 134 N.H. at 606.

Additionally, we disbarred the attorney in *Basbanes' Case*, 141 N.H. at 6, for lying to a marital master "over a period of several months" and for giving false and misleading testimony to a judicial referee at a *de novo* hearing. *See also Cohen's Case*, 143 N.H. 169, 171 (1998) (attorney disbarred for "falsely stating to [his client] that he had filed her bankruptcy petition when he had not done so, . . . signing her name to the bankruptcy petition without her consent, . . . filing [it] after [she] instructed him not to do so, and . . . falsely answering bar counsel's interrogatory"); *Eshleman's Case*, 126 N.H. 1, 2-3 (1985) (attorney disbarred where his trust account was out of trust by more than $70,000.00, he lied at his disciplinary hearing and failed to notify the PCC or this court that he had been arrested for grand theft); *Jones' Case*, 137 N.H. 351, 353-56, 360-61 (1993) (attorney disbarred where, against client's instructions, he leaked letter to news reporters, repeatedly lied to client about source of leak, and filed and signed numerous pleadings falsely accusing government of being source of leak); *Nardi's Case*, 142 N.H. 602, 607-08 (1998) (attorney disbarred where he knowingly violated terms of escrow agreement by relinquishing control of funds expressly given to him for safekeeping, knowingly made false statements to client, and had been privately reprimanded for misconduct in the past).

In cases in which there has not been repeated deceit or dishonesty, we have not heretofore ordered the attorney disbarred. At oral argument, counsel for the ADO conceded that we have never before disbarred an attorney for engaging in a single episode of deceitful conduct.

For instance, we ordered public censure in *O'Meara's Case*, 150 N.H. at 159-60, and *Welts' Case*, 136 N.H. 588, 592 (1993), where the attorneys in these cases engaged in an isolated instance of deceit. In *O'Meara's Case*, 150 N.H. at 158, the attorney lied to the court about the date on which he had a subpoena issued and made allegations about his wife in a motion that were "gross embellishments on the truth lacking sound factual predicates." (Quotation omitted.) We observed that the attorney's dishonesty involved "two isolated incidents of misconduct." *O'Meara's Case*, 150 N.H. at 159. We ruled that in the absence of factors that justified imposing suspension, such as "engag[ing] in a concerted course of unethical conduct that involved multiple incidents occurring over an

extended period of time," and because of the presence of mitigating factors, public censure was the proper sanction. *Id.* at 160.

Similarly, in *Welts' Case*, 136 N.H. at 593, we ordered public censure of the attorney where his violations of the Rules "flow[ed] essentially from an isolated course of conduct, which he voluntarily disclosed in a manner calculated to mitigate prejudice to his clients." In that case, the attorney lied to his clients about filing a lawsuit on their behalf. *Welts' Case*, 136 N.H. at 590.

In other cases involving dishonesty, we have suspended the attorney. In *Feld's Case*, 149 N.H. 19, 21 (2002), for instance, we suspended the attorney for one year where he "orchestrated, assisted, counseled and tolerated the formulation of inaccurate and incomplete sworn [discovery] responses that he knew were inaccurate." (Quotation omitted.) We also suspended the attorney in *Bruzga's Case*, 145 N.H. at 71-72, for one year where he knowingly made misrepresentations about his ex-wife in an abuse and neglect petition, submitted the petition to harass and injure her, and instead of expressing remorse for his misconduct, engaged in "semantical gamesmanship" to justify it. We explained that disbarment was not proper, in part, because the attorney faced discipline for the first time in his career and because the violations occurred in a single event. *Bruzga's Case*, 145 N.H. at 72.

The respondent's conduct was significantly less egregious than that of the attorneys in cases in which we have ordered disbarment. The respondent's Rule violations, unlike those of the attorneys in disbarment cases, involved an isolated instance of misconduct. His conduct did not span "several years," *Wolterbeek's Case*, 152 N.H. at 717, or even "several months," *Basbanes' Case*, 141 N.H. at 6; nor did it involve a continuing course of dishonest conduct, including lying to the PCC, *Astles' Case*, 134 N.H. at 604-05; *Cohen's Case*, 143 N.H. at 171. Moreover, unlike the attorneys in *Wolterbeek's Case*, 152 N.H. at 716-17, and *Nardi's Case*, 142 N.H. at 608, the respondent has no prior disciplinary offenses. Additionally, unlike the attorneys in *Basbanes' Case*, 141 N.H. at 7-8, and *Astles' Case*, 134 N.H. at 606, he cooperated fully with the PCC's investigation and "displayed genuine remorse by admitting his misconduct in the stipulation," *Wolterbeek's Case*, 152 N.H. at 716.

On the other hand, his conduct was more egregious than that of the attorneys in *O'Meara's Case* and *Welts' Case*. There was no finding in this case, unlike in *O'Meara's Case*, 150 N.H. at 159, and *Welts' Case*, 136 N.H. at 593, that the respondent suffered from personal and emotional problems that contributed to his misconduct.

Based upon our consideration of all of the above, we agree with the PCC's recommendation that the respondent be suspended from the

practice of law. We decline the ADO's invitation to disbar the respondent for the single episode of deceit at issue. While there may be instances where a single episode of deceit is sufficiently egregious to warrant disbarment, this is not such an instance.

■ We disagree with the PCC, however, that a six-month suspension is sufficient "to protect the public, maintain public confidence in the bar, preserve the integrity of the legal profession, and prevent similar conduct in the future." *Richmond's Case*, 152 N.H. 155, 159-60 (2005). Weighing the severity of the respondent's misconduct, his dishonest or selfish motive and his years of experience against his lack of a prior disciplinary record, his cooperation and remorse, and the loss of his real estate license, we conclude that the respondent should be suspended from the practice of law for two years. *See Feld's Case*, 149 N.H. at 30. We hold that suspending the respondent from the practice of law in New Hampshire for two years satisfies the goals of the attorney discipline system by protecting the public and preserving the integrity of the legal profession. The period of suspension shall run from the date upon which this order becomes final. To be reinstated, the respondent shall comply with all requirements for reinstatement set forth in Supreme Court Rule 37(14). We further order the respondent to reimburse the attorney discipline system for all expenses incurred in the investigation and enforcement of discipline in this case. SUP. CT. R. 37(19).

*So ordered.*

BRODERICK, C.J., and GALWAY and HICKS, JJ., concurred.