Attorney Discipline Office
No. LD-2006-004

GREW'S CASE

Argued: September 13, 2007
Opinion Issued: October 30, 2007

*Landya B. McCafferty*, of Concord, on the brief and orally, for the Attorney Discipline Office.

*Upton & Hatfield, LLP*, of Portsmouth (*Russell F. Hilliard* on the brief and orally), for the respondent.

DUGGAN, J. This is an appeal by the Attorney Discipline Office (ADO) of the decision of the Supreme Court Professional Conduct Committee (PCC) to suspend the respondent, James T. Grew, from the practice of law in New Hampshire for six months. The ADO argues that the respondent should be disbarred. We disagree and order the respondent suspended for two years effective from the date of our original order of suspension.

I

The parties stipulated to the following facts. The respondent was admitted to practice law in New Hampshire on October 26, 2004. On November 26, 2004, while backing out of the Hampton Plaza in his Ford Econoline Van (Econoline Van), the respondent hit the bumper of a parked car. The owner, Jonathan Labrie, was in his car at the time of the accident.

At the scene, the respondent gave Labrie his telephone number, current home address, and the information from his driver's license. The respondent also told Labrie that he was unsure whether his Econoline Van was currently insured, and requested that Labrie contact him later to get the vehicle's identification information. Labrie, however, wrote down the license plate number and a description of the Econoline Van.

On November 27, 2004, the respondent contacted Progressive Insurance Company and falsely reported that at the time of the accident he had been driving his green Ford Windstar Van (Ford Windstar). The respondent made this false claim because, at the time, he was carrying insurance on his Ford Windstar but not on his Econoline Van. Progressive issued a claim number, and informed the respondent that a claims adjuster would contact him at a later date. The following day, the respondent left Labrie a voicemail which stated, in pertinent part:

> Hi John, it's James Grew, the gentleman who unfortunately backed into you the other day. I just wanted to let you know the insurance company is Progressive . . . . I'll call Progressive today, and I will let them know that I backed into you, um, and there's some damage to your car and that I was driving the green Ford Windstar, and, um, I will give you a call back after I talk to them, thank you.

A few minutes later, the respondent again phoned Labrie and left a voicemail which, in relevant part, stated:

> Hi John, it's James Grew again, I just want to follow up with you, um, I just called Progressive . . . . I, uh, opened up a claim so that you can get your car repaired, quickly, I hope . . . . I explained to the agency . . . that I backed into you in the parking lot off of Lafayette . . . and that, um, my van hit your front bumper, and I explained that I was driving the Ford Windstar van, which is a dark green, you may want to note that it's a dark green van . . . and again, I apologize, if you want to give me a call today, just so we can [sic] the facts straight it will help out . . . .

On November 29, 2004, a Progressive claims adjuster called the respondent who, once again, falsely reported that he had been driving the Ford Windstar at the time of the accident. The claims adjuster then called Labrie, who informed him that not only had the respondent been driving the Econoline Van, but that the respondent had also been calling Labrie in an attempt to persuade him to falsely report that the Ford Windstar had been the vehicle involved in the accident. The next day, the respondent called Labrie yet again and left a voicemail requesting a return call so that he and Labrie could "get [their] facts straight."

On December 14, 2004, Labrie's insurance provider, Geico Indemnity Company, sent the respondent a formal demand letter in an attempt to recover $1,802.11 for repairing Labrie's car. On December 16, 2004, Ralph D. Gault, a Progressive claims investigator, sent the respondent a letter requesting a conference in order to discuss "issues which have surfaced

regarding this loss." Receiving no response, Gault followed up on his letter by leaving his business card with the respondent on December 21, 2004.

The following day, the respondent wrote a check to Geico for $1,802.11 and sent the following email to Gault:

> Thank you for leaving your card yesterday. Email is a good way to communicate, for December and January are always very busy months. I wanted to inform you that I have paid for [Labrie's] repair out of my own pocket. His damage was minimal. Progressive is not responsible for his claim. Thank you for your assistance.

The respondent was subsequently indicted by the Rockingham County Grand Jury for one count of insurance fraud, a class B felony. However, on April 7, 2006, the respondent entered into a plea bargain that reduced the felony to a class A misdemeanor. The Superior Court (*Morrill*, J.) sentenced the respondent, in accordance with the plea agreement, as follows: (1) twelve months in the House of Corrections, all suspended for one year on good behavior and compliance with the terms of the sentencing order; (2) $1,000 fine; (3) $284 in restitution to Progressive; and (4) 100 hours of community service.

On May 31, 2006, we issued an order ruling that the respondent's conviction for class A misdemeanor insurance fraud constituted a "serious crime" under Supreme Court Rule 37(9)(b). Accordingly, we ordered the respondent immediately suspended from the practice of law, *see* SUP. CT. R. 37(9)(a), and referred the matter to the PCC on the issue of sanction, *see* SUP. CT. R. 37(9)(d). The PCC imposed a six-month suspension, emphasizing the respondent's lack of a prior disciplinary record, his cooperation with the disciplinary process, his sincere remorse, and the fact that the incident "was an isolated one in [the respondent's] personal and professional history."

The PCC also found a letter submitted by the respondent to be "particularly significant." In the letter, the respondent explained how, at the time of the accident, he was under extreme financial and emotional duress because: (1) he had grown up poor and incurred substantial debt in obtaining his law degree; (2) he had not been earning enough to provide for his family from his practice representing low-income clients; (3) his wife's salary had recently been reduced because of employment restructuring; (4) his wife had also required an extended stay in the hospital due to complications during birth; (5) one of his three children had been in and out of the hospital for severe allergies; and (6) his father had recently moved in with the family because he was suffering from Alzheimer's disease. At the same time, the PCC found, the respondent's

"professional life, until this incident, reflect[ed] his integrity, commitment to serving the public, and commitment to the legal profession." The ADO has appealed the PCC's order, arguing that the respondent should instead be disbarred.

## II

■ "[W]e retain ultimate authority to determine whether, on the facts found, a violation of the rules governing attorney conduct has occurred and, if so, the appropriate sanction." *Coddington's Case*, 155 N.H. 66, 68 (2007) (quotation omitted). In exercising this authority, we remain "mindful that the purpose of attorney discipline is not to inflict punishment, but rather to protect the public, maintain public confidence in the bar, preserve the integrity of the legal profession, and prevent similar conduct in the future." *Id.* (quotation omitted). Accordingly, each attorney discipline case is judged upon "its own facts and circumstances, taking into account the severity of the misconduct and any mitigating circumstances appearing in the record." *Id.* Ultimately, the attorney's behavior, and not just the number of rules broken, is determinative of the gravity of the unprofessional conduct. *Id.*

In assessing the propriety of a particular sanction, we look to the American Bar Association's STANDARDS FOR IMPOSING LAWYER SANCTIONS (2005) (STANDARDS) for guidance. *Bosse's Case*, 155 N.H. 128, 131 (2007). The STANDARDS provide four factors to consider when imposing a sanction: (1) the duty violated by the lawyer; (2) the lawyer's mental state; (3) the actual or potential injury caused by the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors. STANDARDS, *supra* § 3.0; *Coddington's Case*, 155 N.H. at 68. The first three factors are used as an aid in categorizing the attorney's misconduct and identifying a baseline sanction. *See Wolterbeek's Case*, 152 N.H. 710, 714 (2005). We then consider the effect, if any, of aggravating or mitigating factors in arriving at the ultimate sanction. *Bosse's Case*, 155 N.H. at 131.

■ In this case, the respondent breached his ethical duty to maintain personal integrity, *see* STANDARDS, *supra* § 5.1, by engaging in misdemeanor-level insurance fraud, which is a "serious crime" under Rule 37(9)(b). Under the STANDARDS, when an attorney engages in fraud, absent mitigating circumstances, disbarment is generally the sanction. STANDARDS, *supra* § 5.11. A severe sanction is called for in such cases because "the privilege of practicing law [comes with] the concomitant responsibilities of truth, candor and honesty." *Bosse's Case*, 155 N.H. at 131 (quotation omitted). Where an attorney breaches his ethical duty to maintain personal integrity, "public confidence in the integrity of officers

of the court [in general] is undermined . . . ." STANDARDS, *supra* § 5.0. Accordingly, it is of the utmost importance that "every attorney at all times . . . be truthful." *Bosse's Case*, 155 N.H. at 131 (quotation omitted). The first factor, standing alone, thus indicates that disbarment is the baseline sanction for the respondent.

With respect to the second factor, the PCC found that the respondent's "mental state was more a reflection of his initial panic over the family and financial ramifications of the accident, than evidence of a specific intent to defraud his insurance carrier." In its finding, the PCC appears to have conflated factor two, the respondent's mental state, and factor four, mitigating factors. The respondent's "mental state may be one of intent, knowledge, or negligence." STANDARDS, *supra* § 3.0 cmt. What is relevant to the second factor is the volitional nature of the respondent's acts, and not the external pressures that could potentially have hindered his judgment. Therefore, even if panicked, the proper inquiry is whether the respondent acted with either: (1) the conscious objective to defraud Progressive; (2) the knowledge of the nature or attendant circumstances of his conduct; or (3) a negligent failure to notice a substantial risk that fraud would result from his actions. *See* STANDARDS, *supra* s. II, at 6.

■ The record here shows that respondent's mental state was "one of intent." STANDARDS, *supra* § 3.0 cmt. The respondent admits that his conduct "constituted a crime." Indeed, he pled guilty to the charge of insurance fraud and has thus acknowledged that he acted with "*intent* to injure, defraud or deceive." RSA 638:20, II (2007) (emphasis added); *see Levy v. Assoc. of the Bar of City of New York*, 333 N.E.2d 350, 352 (N.Y. 1975) (holding that an attorney convicted of a misdemeanor is estopped from re-litigating his guilt in a subsequent attorney discipline matter). We therefore hold that the respondent acted with intent, which is "[t]he most culpable mental state." STANDARDS, *supra* s. II, at 6.

■ As to the third factor, we note that the respondent's conduct caused actual injuries to both the public and the legal profession. *See* STANDARDS, *supra* s. III, at 9; *Bosse's Case*, 155 N.H. at 132. The record indicates that the respondent's acts harmed Progressive, which expended time and money investigating the false claim. Moreover, the respondent caused injury to the legal profession by engaging in a deceitful course of conduct. As we have stated previously, "no single transgression reflects more negatively on the legal profession than a lie." *Bosse's Case*, 155 N.H. at 132 (quotation omitted). The respondent's lie was particularly egregious because it was made in support of a criminal scheme. In light of these injuries, as well as the ethical duty breached and the respondent's culpable mental state, we hold that the baseline sanction is disbarment.

We next consider the numerous mitigating factors present in this case. *See Eshleman's Case*, 126 N.H. 1, 5 (1985). Both parties agree that we should consider as mitigation the respondent's: (1) lack of a prior disciplinary record, *see* STANDARDS, *supra* § 9.32(a); (2) efforts to make restitution prior to being indicted, *see id.* § 9.32(d); (3) cooperation with the disciplinary process, *see id.* § 9.32(e); and (4) sincere remorse, as demonstrated by his admission that he committed the crime, *see id.* § 9.32(l); *see also Wolterbeek's Case*, 152 N.H. at 716 ("Where deceit is involved, a lawyer must admit to his professional misconduct to truly demonstrate remorse." (quotation omitted)). We agree with the parties that these mitigating factors are applicable in this case.

However, the respondent urges us to also consider as mitigation the fact that: (1) he had personal and financial problems that contributed to his decision to engage in a criminal course of conduct, *see* STANDARDS, *supra* § 9.32(c); (2) he was relatively inexperienced in the practice of law, *see id.* § 9.32(f); (3) he has suffered the imposition of other penalties; namely, his criminal conviction and one-year suspension from the practice of law in Massachusetts, *see id.* § 9.32(k); and (4) the incident was unrelated to his practice of law. The ADO disagrees, arguing that these factors should not be considered as mitigation. We address each asserted factor in turn.

■ First, we hold that the respondent's personal and financial problems are a mitigating factor. STANDARDS, *supra* § 9.32(c) ("Mitigating factors include ... personal or emotional problems ...."); *see also Coddington's Case*, 155 N.H. at 71-72 (holding that depression is a personal problem warranting mitigation). As noted by the PCC, at the time of the accident the respondent was going through a period of severe "personal and financial stress." While the issues he faced in his private life are not unique, and certainly do not excuse his conduct, they are at least worthy of consideration as an extenuating circumstance. *See St. Pierre's Case*, 113 N.H. 198, 199 (1973). Despite the purported prevalence of financial stress in many acts of attorney defalcation, we believe that it is important to distinguish those acts motivated by greed from those motivated by desperation by considering such personal and economic stressors. *See* STANDARDS, *supra* § 9.22(b) (treating the existence of a selfish motive as an aggravating factor).

■ Second, the respondent's inexperience in the practice of law is not a mitigating factor in this case. STANDARDS, *supra* § 9.32(f). Inexperience is only a ground for leniency when the attorney's offending conduct resulted therefrom. *Compare Eshleman's Case*, 126 N.H. at 6 (refusing to treat inexperience as mitigation where attorney mismanaged his client's trust account and lied to a tribunal regarding the same conduct), *with*

*Disciplinary Action Against Jensen*, 468 N.W.2d 541, 543, 545 (Minn. 1991) (treating inexperience as a mitigating factor where the attorney had, *inter alia*, incompetently represented a client by neglecting to follow well-established procedural rules). To be relevant, there must be a nexus between the inexperience and the offending conduct. Here, the respondent's culpability arises from an act performed outside of the practice of law, the illegality of which is evident to any lay person. It does not take a seasoned legal intellect to understand that insurance fraud is both illegal and morally reprehensible. That the respondent was newly admitted to the bar is therefore irrelevant.

■ Third, the criminal penalties suffered by the respondent in response to his conviction for insurance fraud are "other penalties" that warrant mitigation. *See* STANDARDS, *supra* § 9.32(k) ("Mitigating factors include ... imposition of other penalties or sanctions ...."). While the attorney discipline system does not exist "to inflict punishment," *Bosse's Case*, 155 N.H. at 131, it nevertheless shares with the criminal justice system a common goal of deterring future unethical or criminal conduct. *People v. Hook*, 91 P.3d 1070, 1074 (Colo. 2004). Where an attorney's offending conduct has resulted in imposition of a criminal penalty, therefore, that attorney will generally be deterred from engaging in that same conduct in the future. Accordingly, because one of the objectives of the attorney discipline system is served by the criminal sentence, we consider those criminal penalties as mitigation when determining the correct sanction. *See In re Conduct of McDonough*, 77 P.3d 306, 311 (Or. 2003) (finding the existence of criminal penalties to be a mitigating factor); *Hook*, 91 P.3d at 1074 (mitigating an attorney's sanction in response to the imposition of a criminal sentence).

■ This logic does not apply with equal force, however, to the respondent's suspension from the practice of law in Massachusetts. If anything, when an attorney has been disciplined in another state, we typically consider that other state's sanction in the interests of parity, *see* SUP. CT. R. 37(12), and not for mitigation. Accordingly, the respondent's criminal sentence, and not his suspension from the practice of law in Massachusetts, is a mitigating factor in this case.

■ Finally, we do not find the fact that the respondent was acting as a private citizen at the time of the incident to be a mitigating factor. "Even though [the respondent] engaged in this conduct in his capacity as a [private citizen], his conduct adversely reflects upon his fitness to practice." *Bosse's Case*, 155 N.H. at 131. To be sure, there is a distinction to be made between those cases where an attorney's actions "directly

threaten his clients" and those where his actions do not. *See Reiner's Case,* 152 N.H. 594, 598 (2005). But that line is drawn for the purpose of increasing the sanction given to attorneys who breach the special fiduciary duties created by the attorney-client relationship, and not for the purpose of lessening the sanction affixed to an attorney who was acting as a private citizen.

In support of its argument for disbarment, the ADO offers as an aggravating factor the fact that the respondent had a selfish and dishonest motive. *See* STANDARDS, *supra* § 9.22(b). Although the respondent was conceivably acting under duress from the personal and financial problems he was suffering, we agree that this aggravating factor is applicable. At root, the respondent's intent was to defraud Progressive so that he would not have to pay out of pocket for Labrie's losses. His motive was therefore about personal pecuniary gain, which is decidedly selfish in nature.

## III

Based upon our consideration of the foregoing mitigating and aggravating factors, we agree with the PCC that, despite a baseline sanction of disbarment, suspension is the appropriate sanction in this case. We do not agree, however, that the six-month suspension recommended by the PCC is sufficient to further "the goals of the attorney discipline system [of] protect[ing] the public, maintain[ing] public confidence in the bar, preserv[ing] the integrity of the legal profession and preventing similar conduct in the future." *Wolterbeek's Case,* 152 N.H. at 717. We conclude instead that a two-year suspension is required. *See Bosse's Case,* 155 N.H. at 135.

This sanction accords with those in prior attorney discipline cases. *See Feld's Case,* 149 N.H. 19, 21, 30 (2002) (suspending an attorney for one year where he "orchestrated, assisted, counseled and tolerated the formulation of inaccurate and incomplete sworn [discovery] responses that he knew were inaccurate" (quotation omitted)); *Bruzga's Case,* 145 N.H. 62, 71-72 (2000) (suspending an attorney for one year for making misrepresentations about his ex-wife in an abuse and neglect petition, submitting said petition in an effort to harass, and "[e]ngaging in semantical gamesmanship" to justify his actions).

Moreover, as noted by the PCC, the incident underlying this case is "an isolated one in [the respondent]'s personal and professional history." This case is therefore analogous to *Bosse's Case,* in which the disciplined attorney had forged a third party's signature to a real estate listing document and misinformed the listing agent that "the purchase and sale agreement was 'in effect.'" *Bosse's Case,* 155 N.H. at 129-30. In that case,

we noted that the two separate acts were technically only one "instance of misconduct" and, after weighing the existence of three mitigating factors against the fact that Bosse had a selfish motive and substantial experience in the practice of law, we imposed a two-year suspension to run prospectively from the date of the order, April 4, 2007. *Id.* at 132, 134-35. However, because Bosse had already been suspended since September 19, 2006, the date of the PCC's original order for a six-month suspension, *see* SUP. CT. R. 37(3)(c)(2) (granting the PCC authority to "administer a . . . suspension not to exceed six (6) months"), Bosse was effectively suspended for over two years and six months.

Unlike in *Bosse's Case*, however, the respondent's conduct was the result, at least in part, of personal and financial problems. *See Bosse's Case*, 155 N.H. at 134 (explaining how Bosse's conduct was more egregious than prior cases because there were no "personal and emotional problems that contributed to his misconduct"). In addition, unlike in *Bosse's Case*, the aggravating factor of "substantial experience in the practice of law" is not applicable. *Id.* at 132. Therefore, because the respondent's conduct warrants less of a sanction than that in *Bosse's Case*, we hold that the respondent's two-year suspension will run from May 31, 2006, the date of our original order of temporary suspension.

Prior to reinstatement, the respondent must comply with all requirements articulated in Supreme Court Rule 37(14). As agreed by the parties in their stipulation, the respondent is also ordered to reimburse the attorney discipline system for all expenses incurred in the investigation and enforcement of discipline in this case. *See also* SUP. CT. R. 37(19).

*So ordered.*

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.